James D. Smith, 016760
David D. Garner, 020459
Sarah P. Lawson, 036436
Alexandria N. Karpurk, 037029
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2000
Phoenix, Arizona 85012
602-640-9000
jsmith@omlaw.com
dgarner@omlaw.com
slawson@omlaw.com
akarpurk@omlaw.com

Attorneys for Defendant

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Heather Rooks,<br><br>                    Plaintiff,<br><br>          v.<br><br>Peoria Unified School District,<br><br>                    Defendant. | No. CV-23-02028-PHX-MTL<br><br>DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT<br>—AND—<br>CROSS-MOTION FOR SUMMARY JUDGMENT |

Immediately upon taking her seat on the Governing Board of the Peoria Unified School District in January 2023, Heather Rooks appropriated the dais to recite Bible verses during the portion of board meetings that the Arizona Open Meeting Law reserves for presenting a "brief summary of current events." A.R.S. § 38-431.02(K).

Throughout 2023, Peoria Unified School District received complaints about Ms. Rooks's frequent recitations, including multiple letters from outside legal organizations, citing case law and legal analysis claiming that Ms. Rooks's recitations violate the law and threatening to sue the District. The Board sought advice from its own legal counsel to assess and understand these claims. Upon review, the Board's legal counsel opined that the Biblical recitations violate the Establishment Clause and were independently impermissible under Arizona's Open Meetings Law ("OML").

The opinion offered by the Board's counsel is not—and has never been— "adopted" by the Board, nor implemented by the District as a District "policy." On the contrary, and as with any legal advice, Board members as the client remained at liberty to follow or reject that advice, as they deemed appropriate.[1]

Indeed, Ms. Rooks initially did just that—disregarded the advice from the Board's legal counsel and continued her recitations. And the District and the Board have not taken or threatened to take any action against Ms. Rooks for her recitations. To this day, Ms. Rooks continues to possess and exercise without restriction all the powers, duties, and privileges of her office.

The District has no interest in squelching anyone's religious expression or otherwise entering into politically charged battles that divert the District's resources away from educating children. As for Board members' conduct at meetings, the District's sole objective is to ensure to the best of its ability that the meetings comply with the law and do not expose the District to liability—which is why the Board sought legal advice in the first place.

---

[1] Advice from the Board's legal counsel was never even intended for the public. It was a privileged attorney-client communication. *See* Ariz. Sup. Ct. R. 42, E.R. 1.6.

When Ms. Rooks disagreed with the legal advice from the Board's lawyer, she did not advocate that the Board obtain a second opinion; she did not enlist the First Liberty Institute or others to provide the Board with contrary legal authority and analysis; nor did she direct her disagreement towards what her lawyers describe as the "radical secular organizations"[2] threatening to sue the District. Instead, she decided to sue the District. Thus, she made a legal adversary out of the entity whose constituents elected her and diverted its resources from educating students.

Ms. Rooks's claims are misdirected and not cognizable. First, the Court lacks subject-matter jurisdiction over her claims because Ms. Rooks has suffered no injury. No District policy or action exists to which Ms. Rooks may raise a "pre-enforcement" challenge, and Ms. Rooks impermissibly seeks an advisory opinion. In short, there is no case or controversy.

Even if the insurmountable jurisdictional barrier were removed, Ms. Rooks's claims fail for other reasons:

1. The Arizona OML precludes using the "current events" exception for board members to "fortify themselves" by offering remarks unrelated to a summary of current events.

2. There is no historical practice of religious invocations at public school board meetings, and the Establishment Clause prohibits coercive religious exercise in public school settings.

3. No District policy restricted Ms. Rooks's speech. If Board counsel's legal advice was considered a "policy," it was viewpoint and content neutral, consistent with the Free Speech Clauses under the First Amendment and Arizona Constitution.

4. Likewise, the neutral and generally applicable nature of the alleged "policy" does not substantially burden Ms. Rooks's free exercise.

Summary judgment on all claims is appropriate.[3]

---

[2] *See* Ex. 31. The Court make take judicial notice of this website. *See, e.g.*, *World Nutrition Inc. v. Advanced Enzymes USA*, 2019 WL 5802001, at \*2 (D. Ariz. Nov. 7, 2019) (taking notice of plaintiff's online articles when considering a motion to dismiss); *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1204-05 (N.D. Cal. 2014) (taking notice of plaintiffs' LinkedIn pages).

[3] Count One seeks a declaration that legislative immunity applies to Ms. Rooks. The District does not understand why Ms. Rooks brought this claim—the District has never

# BACKGROUND

## I.    The structure of the District and the Board.

Serving more than 36,000 students each year, the District is one of the largest unified school districts in Arizona. [*See* Doc. 1 ¶ 12.] The District's mission is to "prepare[] every student for a successful future as a responsible citizen" by, among other things, "[f]ostering a culture of active community engagement and inclusiveness." [Ex. 30 (District No. 11 Policy Manual § A).]

A five-member elected Board governs the District. [Doc. 1 ¶ 12.] The Board adopts and ensures implementation of District polices and evaluates the District's educational program and school operations based on such policies. [Ex. 30 (Manual § BBA).] Each member of the Board has an obligation to "vote and act in Board meetings to faithfully and impartially discharge the duties of a Governing Board Member," "accept[,] respect and support the will of the majority vote in all cases," and "represent the Board and the District to the public in a manner that promotes both interest and support." [*Id.*]

## II.    Ms. Rooks immediately began reciting Bible verses during board meetings, typically with students present.

After her election in November 2022, Ms. Rooks joined the Board in January 2023. [Doc. 1 ¶ 14.] At ten meetings between January 12 and June 22, Ms. Rooks recited a Bible verse. [*Id.* ¶¶ 20-29.] The Board received written complaints from two groups about the recitations, with detailed legal analysis supporting their positions. [*Id.* ¶¶ 30, 36.]

Ms. Rooks's statements always came during the "Board Comments" portion of meetings as she sat on the dais with the entire Board.[4]  Contrary to Ms. Rooks's assertion (Doc. 34 at 5, 7), the Board Comments are not a free-wheeling opportunity for Board

threatened to sue Ms. Rooks. This claim seems aimed at entities Ms. Rooks chose not to sue.

[4] Ex. 6 at PUSD-Rooks_000057; Ex. 8 at PUSD-Rooks_000096; Ex. 10 at PUSD-Rooks_000175; Ex. 12 at PUSD-Rooks_000205; Ex. 14 at PUSD-Rooks_000236; Ex. 16 at PUSD-Rooks_000272-3; Ex. 18 at PUSD-Rooks_000308; Ex. 20 at PUSD-Rooks_000353; Ex. 22 at PUSD-Rooks_000401 (meeting excerpts).

members to offer "individual remarks entirely of their own choosing."[5] Rather, that portion of the meeting reflects a narrow authorization under the Arizona OML, which permits a "brief summary of current events" that are not specifically listed on the agenda as they relate to board members' service, such as publicly recognize schools, groups, or individuals who have made a contribution to the district. A.R.S. § 38.431.02(K).

Unremarkably, students often attended Board meetings. They might receive recognition, perform for the Board and attendees, or speak on matters affecting them. This table summarizes Ms. Rooks's statements and any students mentioned as attending.[6]

| Meeting Date | Ms. Rooks's Bible Recitations | Students Noted as Attending |
|---|---|---|
| 01/12/2023 | "Have I not commanded you? Be strong and courageous. Do not be afraid; do not be discouraged, for the Lord your God will be with you wherever you go." [Doc. 1 ¶ 20 (Joshua 1:9).] | |
| 02/09/2023 | "So do not fear, for I am with you; do not be dismayed, for I am your God. I will strengthen and help you; I will uphold you with my righteous right hand." [Doc. 1 ¶ 21 (Isaiah 41:10).] | "Coyote Hills Elementary eighth grader, Ethan Greenwood . . . ." [Ex. 6 at PUSD-Rooks_000057.] |
| 02/23/2023 | "Train up a child in the way he should go and when he is old, he will not depart from it." [Doc. 1 ¶ 22 (Proverbs 22:6).] | "Ava Wells, Student Body President, Centennial High School . . . . Mrs. Airey then introduced Mr. Davis and his students. Mr. Davis said that it really is all about the kids |

---

[5] The Board comments description most often is at § 4.2 of the agendas, less often at § 6.2, and once at § 4.6, and states: "The purpose of this item is for Board members to publicly recognize schools, groups, or individuals who have made a contribution to the district, as well as share information related to their service as Board members."

[6] Of course, the minutes would not note students attending who did not participate in, or receive recognition at, the meeting.

| | | | standing behind him." [Ex. 8 at PUSD-Rooks_000096.] |
|---|---|---|---|
| 03/09/2023 | "Be on guard. Stay awake, stand firm in your faith, be brave, be strong." [Doc. 1 ¶ 23 (1 Corinthians 16:13).] | | "Fefe Makuei, Student Body President of Ironwood High School. . . . [Four elementary school] winners of the Patriotic Speech Contest. . . . Sunrise Mountain High School . . . [s]ophmore, Austin Fisk and senior, Christian Newman . . . ." [Ex. 10 at PUSD-Rooks_000171.] |
| 04/13/2023 | "I keep my eyes always on the Lord. With him at my right hand, I will not be shaken." [Doc. 1 ¶ 24 (Psalm 16:8).] | | "Ava Wells, Student Body President, Centennial High School. . . . Olivia Fray (student) . . . . Isabella Mahl (student from Sunset Heights) . . . . Mikah Dyer (junior at Ironwood High School) . . . . Alexis Yance (student) . . . . " [Ex. 12 at PUSD-Rooks_000205, 207-08.] |
| 04/27/2023 | "Keep my safe, my God, for in you I take refuge." [Doc. 1 ¶ 25 (Psalm 16:1).] | | "Mikah Dyer (student) . . . . Mikah Dyer (Ironwood student) . . . ." [Ex. 14 at PUSD-Rooks_000238, 240.] |
| 05/11/2023 | "God is greater than the giants you face." [Doc. 1 ¶ 26 (John 4:4).] | | "Brianna Cooney (student) . . . . Ava Snyder (student, Liberty Senior) . . . . Emma Heiser (student) . . . . " [Ex. 16 at PUSD-Rooks_000273-74.] |
| 05/22/2023 | "That your faith might not rest in the wisdom of men but in the power of God." [Doc. 1 ¶ 27 (1 Corinthians 2:5).] | | "Diego Holquin (student) . . . . Carter Ashton (student) . . . . Kendall Black (student) . . . . Ava Snyder (student) . . . . Mikah Dyer (student) . . . . " [Ex. 18 at PUSD-Rooks_000309, 312.] |
| 06/08/2023 | "Therefore, put on every piece of God's armor so that you will be able to resist the enemy in the time | | |

| | | |
|---|---|---|
| | of evil. Then after the battle you will be standing firm." [Doc. 1 ¶ 28 (Ephesians 6:13).] | |
| 06/22/2023 | "Let us hold tightly without wavering to the hope we affirm, for God can be trusted to keep his promise." [Doc. 1 ¶ 29 (Hebrews 10:23).] | "Breanna Cooney (student) . . . ." [Ex. 22 at PUSD-Rooks_000403.] |

**III.     Complaints and litigation threats follow Ms. Rooks's scripture recitations; nonetheless, she continues the recitations from the dais.**

Secular Communities for Arizona, Inc. ("SCA") complained to the Board in February 2023, alleging that Ms. Rooks's Bible recitations reflected a "constitutional violation" and stating that SCA received complaints about the recitations. [Doc. 1 ¶ 30; Doc. 1-2.] The complaint included significant legal analysis of the issue and noted, "It is coercive, embarrassing, and intimidating for citizens from a different religion or nonreligious citizens to display deference toward a religious sentiment in which they do not believe." [Doc. 1-2 at 4.] SCA also analyzed and distinguished *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022). It noted that the coach in *Kennedy* prayed silently after his official duties ended, there was not a captive audience, and the coach's speech was private. [Doc. 1-2 at 3-4.] SCA requested that the Board "inform us in writing . . . of the steps you are taking to remedy these constitutional violations." [*Id.* at 5-6.]

Responsibly, the Board sought advice from its legal counsel. She advised that a Board member praying or reciting scripture during public meetings could lead to liability under the Establishment Clause or the Open Meetings Law. [Doc. 1 ¶¶ 31-32; *see* Doc. 1-3.] Ms. Rooks questioned the legal guidance, which the Board's counsel reaffirmed. [Doc. 1 ¶ 33.]

At the Board's March 9, 2023, meeting, the Board President also reminded the Board that they each "received an email from legal" warning of the potential liability associated with reciting scripture at a Board meeting. [*Id.* ¶ 35 (describing President Sandoval's comments).] Nonetheless, Ms. Rooks continued to recite Bible verses at six

more Board meetings between March and June 2023. [*Id.* ¶¶ 23-29.] Then-Board member Rebecca Hill also recited Bible verses at meetings on May 11, May 22, and June 8. [Doc. 1-4 at 2; Ex. 18 at PUSD-Rooks_000308; Ex. 20 at PUSD-Rooks_000353.][7]

On May 25, 2023, the Board received a complaint from the Freedom From Religion Foundation, Inc. ("FFRF"). [Doc. 1 ¶ 36; Doc. 1-4.] The letter provided additional legal analysis and threatened that "the statements of school board members are attributable to the district" and that the District would be subjected to "unnecessary liability and potential financial strain" if Ms. Rooks and the other Board members did not stop reciting Bible verses during meetings. [Doc. 1-4 at 2-4.] Undaunted, Ms. Rooks again recited scripture during the June 8 and June 22 Board meetings. [Doc. 1 ¶¶ 28-29.]

About one month later, FFRF sent another letter to the Board. [*Id.* ¶ 37; Doc. 1-5.] Two weeks after that letter, the Board's counsel explained to the Board that the two complaining entities were threatening to sue the District. [Doc. 1 ¶ 38; Doc. 1-6 at 2-3.] The Board's counsel opined that the District "would incur significant legal expenses in defending itself against the lawsuit" if litigation resulted. [Doc. 1 ¶ 38; Doc. 1-6 at 3.] Counsel also opined about possible consequences for individual Board members from such litigation. [*See id.*] At no point did the Board's legal counsel, the Board President, or anyone else from the District order or otherwise direct Ms. Rooks not to recite scripture. Rather, Board counsel only suggested that stopping the recitals at Board meetings "would be in the best interest of the District." [*Id.*]

The next day, Ms. Rooks announced that she decided to "refrain from reciting Bible verses" and that she will "have [her] attorneys at First Liberty Institute handle this matter." [Doc. 1 ¶ 40.] At no time did Ms. Rooks offer to provide the Board with any opinion or analysis from her attorneys at First Liberty Institute to refute or counter the

---

[7] Ms. Hill recited Matthew 18:6 on May 22. That verse refers to drowning people who interfere with one's Christian faith. "If anyone causes one of these little ones—those who believe in me—to stumble, it would be better for them to have a large millstone hung around their neck and to be drowned in the depths of the sea."

1    analysis provided by SCA, FFRF, or the Board's legal counsel. Instead, she filed suit two

2    months later. [Doc. 1 ¶ 41.]

3    **IV.    Ms. Rooks concedes that the District has not taken any action against her.**

4          There is no dispute that Ms. Rooks has not suffered any punishment or loss of

5    privilege because of her recitations. She remains on the Board. She retains all powers and

6    rights of Board membership. She remains free to attend and fully participate in all Board

7    decisions and other activities. [Ex. 33 at 8:1-14.]

8                          **APPLICABLE LEGAL STANDARD**

9          Summary judgment is warranted under Federal Rule of Civil Procedure 56(a)

10   because the Court lacks subject matter jurisdiction and because no material facts are

11   disputed and the District is entitled to judgment as a matter of law. Plaintiff bears the

12   burden of proof on many dispositive issues this Motion raises; summary judgment is

13   proper because Plaintiff lacks admissible evidence meeting her burden. *E.g.*, *Celotex*

14   *Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

15                                **ARGUMENT**

16   **I.    Ms. Rooks lacks standing—there is no case or controversy.**

17         Article III limits federal courts' jurisdiction to cases or controversies.  U.S. Const.

18   art. III, § 1.  A plaintiff bears the burden of meeting "the irreducible constitutional

19   minimum" of standing to meet that case or controversy requirement.  *Lujan v. Defs. of*

20   *Wildlife*, 504 U.S. 555, 560 (1992). First Amendment challenges are brought (1) "pre-

21   enforcement" to stop the government "from enacting laws that regulate protected speech"

22   or (2) post-enforcement to remedy the government "subjecting individuals to retaliatory

23   actions after the fact for having engaged in protected speech." *Twitter, Inc. v. Paxton*, 56

24   F.4th 1170, 1174 (9th Cir. 2022) (citations and internal quotation marks omitted). Ms.

25   Rooks seems to allege both pre-enforcement and post-enforcement retaliatory claims.

26   Though the two types of challenges "carry different requirements for standing," *id.*, Ms.

27   Rooks lacks standing under either standard.

28

1

### A.      Ms. Rooks does not allege a cognizable injury.

2   　　Standing in a retaliation suit requires the plaintiff to establish (1) an "injury in

3   fact"; (2) a "causal connection between the injury" and the defendant's conduct; and

4   (3) that the injury will be "redressed by a favorable decision" of the Court. *Lujan,* 504

5   U.S. at 561 (citation omitted). An injury in fact must be "an invasion of a legally protected

6   interest which is (a) concrete and particularized, and (b) actual or imminent, not

7   conjectural or hypothetical." *Id.* at 560 (internal quotation marks and citations omitted).

8   A "particularized" injury "affect[s] the plaintiff in a personal and individual way."

9   *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (citation omitted).

10   　　Ms. Rooks's claims do not meet the constitutional minimum: she does not identify

11   any "injury in fact" that she suffered, let alone an injury connected to the District's

12   conduct. Ms. Rooks chose to stop reciting Bible verses during Board meetings. [Doc. 1

13   ¶ 40.] And her decision has not led to any cognizable injury. She does not allege that her

14   decision changed her sincerely held religious beliefs, that she faces litigation, or that she

15   suffered monetary or other injury. She does not hint that she lost any privileges, rights, or

16   powers as an elected Board member. *See Twitter, Inc.*, 56 F.4th at 1176 (plaintiff failed

17   to allege a cognizable injury where the only harm alleged was impeded ability to make

18   content moderation decisions).

19   　　Moreover, even if Ms. Rooks *had* suffered a concrete and particularized injury,

20   any injury is not traceable to the District's conduct. No policy or rule of the District

21   "harmed" Ms. Rooks. She does not allege that the District forced her to stop reading Bible

22   verses or threatened her with tangible actions for noncompliance. Ms. Rooks's injury is

23   "conjectural or hypothetical" because she seeks a declaratory ruling to insulate herself

24   from liability *if* she resumes reciting Bible verses during Board meetings. *Lujan*, 504 U.S.

25   at 560 (cognizable injuries are "actual or imminent, not conjectural or hypothetical")

26   (citation and internal quotation marks omitted).

27

28

9

1

2

      **B.**    **Ms. Rooks cannot bring a pre-enforcement challenge (in Counts 3-6) to a nonexistent "policy."**

3

4

5

6

7

8

9

10

      In Counts 3, 4, 5, and 6, Ms. Rooks alleges that a "policy" or an "action[]" adopted by the District violated her First Amendment right to free speech (Doc. 1 ¶¶ 58-59); burdened her First Amendment right to free exercise of religion (*id.* at ¶¶ 63-65); violated Arizona's Free Exercise of Religion Act (*id.* at ¶¶ 69-71); and violated her Arizona constitutional right to free speech (*id.* at ¶¶ 75-76).  Counts 3, 4, 5, and 6 seem to be pre-enforcement challenges because Ms. Rooks does not allege that she experienced any retaliation from the District. She also denies that she is currently reading Bible verses at Board meetings.

11

12

13

14

15

16

17

      The Court weighs three factors to evaluate a pre-enforcement challenge to standing: "(1) whether the plaintiffs have articulated a concrete plan to violate the law in question, (2) whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and (3) the history of past prosecution or enforcement under the challenged statute." *Alaska Right to Life Pol. Action Comm. v. Feldman*, 504 F.3d 840, 849 (9th Cir. 2007) (citation omitted). Ms. Rooks does not satisfy any of the prongs.

18

19

20

21

22

23

24

25

      First, she has not "articulated a concrete plan to violate the law" because such a "law" does not exist. *Id.* The District has not enacted any rule, regulation, or policy that could violate any of Ms. Rooks's rights. The "policy" and "action" of the District underlying Ms. Rooks's complaint are (1) an email from the Board's legal counsel; (2) an email from the Board's executive assistant summarizing counsel's advice; (3) a memorandum from the Superintendent; and (4) a statement by the Board President reminding members of counsel's advice. [Doc. 1 ¶¶ 31, 32, 34, 35.] None is a "policy" of the District.

26

27

28

      Only the *entire* Board can adopt policies. [Ex. 30 (Manual § BBAA).] The Board must follow a two-step process to "consider[] and adopt[] policy proposals to ensure that they are fully studied before final action." [*Id.* § BGB.] And an individual Board member

1    cannot "exercise authority over District affairs" without the Board delegating that

2    authority. [*Id.* § BBAA.]

3         Likewise, the Superintendent cannot unilaterally create District policies. The

4    Superintendent's role is limited to "carrying out, through administrative regulations, the

5    policies established by the Board." [*Id.* § CH.] The Board's legal counsel also cannot

6    create District policy. "Under Arizona law, the governing board of a school district enacts

7    all policies and procedures for schools." *Canzoneri v. Prescott Unified Sch. Dist.*, 2021

8    WL 3931269, at *4 (D. Ariz. Sept. 2, 2021).

9         Simply put, the communications that Ms. Rooks identifies and challenges are not

10   "policies" of the District.[8]  Ms. Rooks cannot claim she has a "plan to violate the law"

11   because there is no "law" until the District or the Board formally create a policy, rule, or

12   regulation.  *See Alaska Right to Life Pol. Action Comm.*, 504 F.3d at 849.  And without

13   any plans to violate a Board "policy" that does not exist, Ms. Rooks lacks standing for a

14   pre-enforcement challenge.

15        Second, Ms. Rooks has not been subjected to "a specific warning or threat to

16   initiate proceedings" by the District.  *Id.*  The record lacks evidence of threats of

17   enforcement by the District. [*See* Ex. 27 ¶¶ 4, 5.] Instead, Ms. Rooks contends that

18   "sustained external pressure from outside activist groups and internal pressure from the

19   Board itself" caused her to stop reciting Bible verses. [Doc. 1 ¶ 40.] There is no evidence,

20   however, that the District contemplated enforcing any rule or policy to make her stop

21   reciting Bible verses. [*See* Ex. 27 ¶ 5.] At most, the "actions" that Ms. Rooks complains

22   of were informal guidance to Board members on how to conduct themselves during

23   meetings. A plaintiff lacks standing when a defendant entity has not "contemplated"

24   enforcement and, "at most," issues "informal guidance" with "no legal effect." *Alaska*

25   *Right to Life Pol. Action Comm.*, 504 F.3d at 849-50 (no standing for pre-enforcement

26   challenge); *cf. Canatella v. California*, 304 F.3d 843, 855 (9th Cir. 2002) (plaintiff's pre-

27   _____

28   [8] Ms. Rooks acknowledges that only the full Board can set District policy. [Doc. 1 ¶ 43.]

enforcement challenge was ripe only when he faced a credible threat of future disciplinary proceedings).

This history shows that the District's and the Board's acts did not affect Ms. Rooks. She continued biblical recitations after the Board's executive assistant related outside counsel's advice in February 2023 and after the Board president cautioned her on March 9, 2023. [Doc. 34 at 9:13-10:17.] She continued after the FFRF complained in May 2023, too. [*Id.* at 9:14-17.] It was only after the FFRF's second complaint in June 2023 and the Board's counsel warned of potential *personal* liability that Ms. Rooks stopped. [Doc. 1-5; Doc. 34 at 10:18-11:4.] The risk of personal liability via a suit from an outside group is not District action.

Third, there is no "history of past . . . enforcement" of any District policy preventing a Board member from reading a Bible verse during a meeting—no such policy exists. *Alaska Right to Life Pol. Action Comm.*, 504 F.3d at 849. The situation is like *Thomas v. Anchorage Equal Rights Commission*, 220 F.3d 1134, 1140–42 (9th Cir. 2000), where a plaintiff's "'some day' intentions" of violating a law that had never been enforced did not create an injury in fact.

Moreover, Ms. Rooks's self-censoring her speech and religious expression does not create standing. "The self-censorship door to standing does not open for every plaintiff. The potential plaintiff must have an actual and well-founded fear that the law will be enforced against him or her." *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003) (citation, alteration, and internal quotation marks omitted). There, a statute arguably prohibited the plaintiff's intended communication, so the plaintiff's self-censorship was based on a "reasonable" "fear." *Id.* That plaintiff had standing to challenge the statute. *Id.* But Ms. Rooks cannot identify any District policy that caused an "actual and well-founded fear" resulting in her self-censorship. Her self-imposed "chilling" of her speech does not create standing. Her "naked assertion that [her] speech has been chilled is a bare legal conclusion upon which [she] cannot rely to assert

1   injury-in-fact." *Twitter, Inc.*, 56 F.4th at 1175 (internal quotation marks and citation

2   omitted).

3       **C.    Ms. Rooks's Counts 1 and 2 seek an advisory opinion.**

4       In Counts 1 and 2, Ms. Rooks seeks a declaratory judgment that she is entitled to

5   "absolute immunity" for reading Bible verses and that doing so does not violate the

6   Establishment Clause. [Doc. 1 ¶¶ 47, 54.]   Of course, Ms. Rooks does not allege any

7   action or contemplated action by the District that could implicate legislative immunity.

8   Instead, Ms. Rooks seeks prospective relief for a hypothetical harm that has not yet

9   occurred. Likewise, the District has not brought a claim, sought relief, or threatened

10  adverse action for Ms. Rooks's potential violation of the Establishment Clause. [Ex. 27

11  ¶¶ 4, 5.]  These Counts request for an advisory opinion.

12      Ultimately, Ms. Rooks seeks a ruling that she would be insulated from liability in

13  *future* suits by *other* parties if she resumes reciting scripture. [*See* Doc. 1 ¶¶ 47, 54; pp.

14  26-27 at (A), (B), and (C).]  Regardless of the relief sought, an actual dispute between

15  adverse litigants must exist to avoid a court issuing an improper advisory opinion.  *See*

16  *Calderon v. Ashmus*, 523 U.S. 740, 746–47 (1998). The prohibition on advisory opinions

17  prevents a plaintiff from using a declaratory judgment to "gain a litigation advantage by

18  obtaining an advance ruling on an affirmative defense." *Id.* at 747.

19      "Allegations of a subjective 'chill' are not an adequate substitute for a claim of

20  specific present objective harm or a threat of specific future harm; the federal courts

21  established pursuant to Article III of the Constitution do not render advisory opinions."

22  *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) (internal quotation marks and citation omitted).

23  "For there to be an actual controversy the defendant must be so situated that the parties

24  have adverse legal interests."  10B Wright & Miller, *Federal Practice & Procedure: Civil*

25  § 2757 (4th ed. Apr. 2023 update). Ms. Rooks's claims do not satisfy those requirements.[9]

26

27

28  _____

[9] The only threatened or hinted legal action is from SCA and the FFRF. [Doc. 1-2, 1-4, &
1-5.] Any adverse legal interests appear to be between Ms. Rooks and those entities.

13

1    The declaratory judgment that Ms. Rooks seeks would not resolve any existing
2    case or controversy.   Instead, it "would merely determine a collateral legal issue
3    governing certain aspects of . . . pending or future suits." *Calderon*, 523 U.S. at 747.

4    In sum, Ms. Rooks does not allege an injury in fact traceable to the District or
5    identify a District "policy" for her pre-enforcement challenge. Counts 1 and 2 seek an
6    advisory opinion from the Court declaring her immune in hypothetical suits from other
7    hypothetical litigants. Accordingly, Ms. Rooks does not meet "the irreducible
8    constitutional minimum" of standing, and the Court lacks jurisdiction. *Lujan*, 504 U.S.
9    at 560.  The Court need not go any further.

10   **II.     Proper application of the OML does not violate Ms. Rooks's rights.**

11   Even if Ms. Rooks's Complaint was not jurisdictionally defective, the Court need
12   not wade into any constitutional analysis to resolve her claims. If Ms. Rooks seeks "to
13   clarify and confirm her rights," the Court need look no further than the language of
14   Arizona's OML. The narrow exception under the OML that authorizes what the District
15   labels "Board comments" does not, as Ms. Rooks erroneously suggests (Doc. 34 at 7),
16   offer an open-mic forum for Board members to make comments "entirely of their own
17   choosing," or to "fortify" themselves to do their duty.  Rather, the "Board comments"
18   must be limited to a "brief summary of current events." A.R.S. § 38-431.02(K).
19   Comments directed at a Board member's personal "fortification" are not current events.
20   Ms. Rooks has no right to appropriate the narrow OML exception for current events to
21   engage in personal fortification of any kind (scriptural or otherwise). Thus, it cannot
22   violate any alleged constitutional right to limit Board members' comments during that
23   "brief summary of current events" that the OML permits.

24              **A.     The OML protects the public's right to be informed of what public
25              bodies' intend to address and to listen to its public deliberations.**

26   The District is a "public body" subject to the OML.  A.R.S. § 38-431(6). The OML
27   ensures the public's right to know what a public body will consider at public meetings.
28   That knowledge lets the public make informed decisions about whether to attend and

listen.  Ariz. Att'y Gen. Op. No. I99-006 at 3 (citing 1962 Ariz. Sess. Laws ch. 138, § 2).  "The legislature enacted the law 'to open the conduct of the business of government to the scrutiny of the public and to ban decision-making in secret.'"  *Welch v. Cochise Cnty. Bd. of Supervisors*, 251 Ariz. 519, 587 ¶ 25 (2021) (quoting *Karol v. Bd. of Educ. Trs.*, 122 Ariz. 95, 97 (1979)).

To give effect to the public's right to open meetings, the OML requires a public body to post a notice of its meetings at least twenty-four hours in advance.  A.R.S. § 38-431.02(A), (C). Likewise, a public body's required notice must include an agenda of the "specific matters to be discussed, considered or decided at the meeting" to let the public prepare for the open meetings.  A.R.S. § 38-431.02(H); *see also* A.R.S. § 38-431.09(A) ("[N]otices and agendas" must "contain such information as is reasonably necessary to inform the public of the matters to be discussed or decided."). Violations of the OML—including the requirement that the agenda specifically identify matters to be discussed—subject public bodies to legal action by the Attorney General or "[a]ny person affected by an alleged violation," and may result in civil penalties, attorneys' fees awards, and potential removal from office.  A.R.S. § 38-431.07.

The OML carves out a narrow exception to the requirement that the agenda list "specific matters to be discussed, considered or decided at the meeting"; the limited exception allows members of a public body to provide "a brief summary of current events"—even though the current events are not specifically listed on the agenda.  A.R.S. § 38-431.02(K).  A summary of current events "consists merely of" a designated person "summarizing recent occurrences without any discussion or feedback from the remainder of the public body."  [Ex. 32 (Ariz. Att'y Gen. Agency Handbook) § 7.7.8 at 7-15.] Thus, ". . . [p]ublic bodies should limit the use of the current events summary provision . . . ."  [*Id.*]

1

2

**B.      The OML prohibits Ms. Rooks from Injecting Other Matters into the "Current Events" Portion of Board Meetings.**

3

4

5

6

7

8

9

10

11

As the OML requires, the District publishes its agenda at least twenty-four hours before each board meeting.  A.R.S. § 38-431.02(A), (C), (H).  Each agenda includes an item titled "Recognitions," with a subheading for "Board Comments."[10]  This agenda item is the Board's current events summary under A.R.S. § 38-431.02(K).  Since this agenda item pertains to current events, the Board member's recognition of "schools, groups, or individuals who have made a contribution to the district," and their discussion of "information related to their service as Board members" need not be specifically listed under § 38-341.02(K). [*See, e.g.*, Ex. 1 at PUSD-Rooks_000002; Ex. 3 at PUSD-Rooks_000108; Ex. 5 at PUSD-Rooks_000022.]

12

13

14

15

16

Relying on the District's posted agenda, the public would fairly expect Ms. Rooks's comments to be limited to her service as a Board member as part of summarizing current events like school visits, recent school achievements, and recognition of students, groups, staff, or individuals. [*Id.*] Ms. Rooks's recitation of Bible verses strays far from a summary of "recent occurrences." A.R.S. § 38-431.02(K).

17

18

19

20

21

22

23

24

In fact, Ms. Rooks's scripture quotations were wholly unconnected with the current events summaries that she shared.  For example, at the February 9, 2023 Board meeting, Ms. Rooks quoted Isaiah 41:10 ("Do not fear for I am with you, do not be dismayed for I am your God"); then she properly summarized two recent events: (1) tours she took of two different schools; and (2) a grant being offered by the Arizona Department of Education. [Ex. 6 at PUSD-Rooks_000057.] Ms. Rooks's recitation was unrelated to the current event summaries properly noticed on that agenda. [*Compare id. with* Ex. 5 at PUSD-Rooks_000022.]

25

26

27

28

[10] Ex. 1 at PUSD-Rooks_000002; Ex. 3 at PUSD-Rooks_000108; Ex. 5 at PUSD-Rooks_000022; Ex. 7 at PUSD-Rooks_000039-40; Ex. 9 at PUSD-Rooks_000069; Ex. 11 at PUSD-Rooks_000147-48; Ex. 13 at PUSD-Rooks_000186; Ex. 15 at PUSD-Rooks_000219-20; Ex. 17 at PUSD-Rooks_000250-51; Ex. 19 at PUSD-Rooks_000287-88; Ex. 21 at PUSD-Rooks_000324-25; Ex. 23 at PUSD-Rooks_000368.

1    Expecting Board members to comply with the OML is not a "pretext," just as

2  expecting Board members to comply with criminal statutes is not a "pretext."  [Doc. 34

3  at 23.]  Rather, complying with the law is an obligation that all Board members have.  *See*

4  A.R.S. § 38-431(6).[11]

5    Ms. Rooks points (Doc. 34 at 23) to two "secular" examples that she claims prove

6  that the District is selectively enforcing the OML: (1) Board Member Underhill's

7  comments about a TED talk referenced at a recent Board retreat and (2) Board Member

8  Sandoval's comments about his role as a pronouncer in a recent school spelling bee. But

9  neither example violates the OML because both were "a brief summary of current events"

10  as allowed by A.R.S. § 38-431.02(K).

11    Board Member Underhill's reference to a TED Talk was directly relevant to the

12  summary of current events. As Member Underhill explained, the TED Talk was part of a

13  recent District Governing Board retreat that she and the other Board members attended.

14  [*See* August 25, 2022 Meeting Recording at 47:42, https://tinyurl.com/2wa7aahh ("*At our*

15  *recent Board retreat*, we discussed a TED Talk by an author called Julia Dhar . . . .")

16  (emphasis added).]  Thus, her discussion of the TED talk did not violate the OML.

17    In the same way, Board Member Sandoval's discussion of the spelling bee also

18  came under the current-events exception. Member Sandoval served as a pronouncer for a

19  regional spelling bee seven days before the meeting. [*See* February 25, 2021 Meeting

20  Recording at 33:07-34:17, https://tinyurl.com/4kv67ktj ("I did have the opportunity to be

21  the pronouncer for the regional spelling bee that took place last Friday, the 19th . . . .").]

22  Member Sandoval recognized the two students who won first and second place and

23  described the students' success as "a testament to our teachers." [*Id.* at 33:10-34:11.]

24  Because Member Sandoval's discussion of his role as a pronouncer was a current event

25  summary under § 38-431.02(K), no OML violation flows from it.

26

27  [11] Ms. Rooks (at 24) then accuses PUSD of "pars[ing] an exception" for current events.
    But PUSD did not create this narrow exception; it comes directly from the OML itself.
28  A.R.S. § 38-431.02(K).

1
2

### C.     Compliance with the OML does not violate Ms. Rooks's Constitutional rights.

3     The OML limits a public body to only discussing, considering, or deciding matters
4  listed on the agenda and "other matters related thereto." A.R.S. § 38-431.02(H). Open
5  meeting laws like Arizona's "may not, and do[] not, restrict or abridge protected speech."
6  *Hays Cnty. Water Plan. P'ship v. Hays Cnty., Tex.*, 41 S.W.3d 174, 182 (Tex. App. 2001)
7  (analyzing Texas's OML analog). Indeed, there is "no restriction of the right of free
8  speech by the necessity of a public official's compliance with the Open Meetings Act
9  when the official seeks to exercise that right at a meeting of the public body of which
10 [s]he is a member." *Id.* at 181-82; *see also Sandoval v. Bd. of Regents of Univ.*, 67 P.3d
11 902, 907 (Nev. 2003) (requiring members of a public body "to comply with Nevada's
12 Open Meeting Law does not infringe on their First Amendment rights").

13    Opining that Ms. Rooks's recitals "are not properly part of a permissible 'summary
14 of current events,'" Board counsel suggested that "it would be in the best interest of the
15 District to cease offering bible verses at Board meetings." [Doc. 34 at 65.] This advice—
16 that Board members comply with the OML—does not abridge any Board member's
17 constitutional rights.

18    The *Hays County* case is on point. There, a public body was sued for violating the
19 open meeting law after one of its commissioners spoke on topics not noticed on the
20 agenda. 41 S.W.3d at 176-77.  In "seek[ing] to avoid the Open Meeting Act's
21 requirements," the public body asserted that the commissioner's "speech was protected
22 by the First Amendment." *Id.* at 181.  The commissioner spoke as an elected commission
23 member, however, not a member of the public.  Also, he "suffered no sanction or penalty"
24 because of his speech; applying the open meeting law did not abridge any protected
25 speech. *Id.* at 182.  Rather, "[t]he problem with [the commissioner's] remarks is not that
26 he could not make them at all, but rather the location and timing of his comments." *Id.*

27    The same is true for Ms. Rooks. The problem is not with Ms. Rooks's recitation
28 of Bible verses; the problem is with Ms. Rooks's reciting Bible verses as an elected Board

1   member during the portion of meetings that is limited to a summary of current events.  *Id.*

2   Ms. Rooks does not dispute that her Bible verses were not properly noticed on the agenda

3   (*see* Doc. 34 at 24), and she attempts to avoid the OML's requirements through reference

4   to inapposite constitutional claims. [*See generally* Doc. 1.] Finally, she admits (Doc. 34

5   at 24) that she quoted the Bible during the Board Comment section of the meetings while

6   speaking as a Board member. Applying the OML to Ms. Rooks does not and cannot

7   violate any constitutional rights.[12]  Accordingly, the District is entitled to judgment as a

8   matter of law on Ms. Rooks's claims.

9   **III.**    **Alternatively, Ms. Rooks did not prove any cognizable claims.**

10      If the Court considers the substance of Ms. Rooks's allegations, then the District

11   is entitled to judgment as a matter of law under Federal Rule of Civil Procedure 56(a).

12   Ms. Rooks did not point to admissible evidence to support her claims.

13      **A.**    **Ms. Rooks's Bible recitations violate the Establishment Clause.**

14      Ms. Rooks alleges that her Bible recitations comport with "200 years of this

15   Nation's historical practices and understandings."  [Doc. 1 ¶ 50.]  While Ms. Rooks

16   correctly identifies that the test set forth in *Kennedy v. Bremerton School District*, 597

17   U.S. 507 (2022), controls the Establishment Clause analysis, she misapplies that test to

18   these facts. [Doc. 34 at 12:7-14.]

19      To determine whether a policy violates the Establishment Clause, the Court must

20   "faithfully reflec[t] the understanding of the Founding Fathers" by looking to "historical

21   practices and understandings." *Kennedy,* 597 U.S. at 535-36 (citations and quotation

22   marks omitted).  Evaluating whether a particular practice is historical is a "fact-sensitive"

23   inquiry, in which the Court considers "the setting in which the prayer arises and the

24   audience to whom it is directed." *Town of Greece, N.Y. v. Galloway*, 572 U.S. 565, 587

25   (2014).

26

27

28   
---
[12] The open meeting law can be used as both a sword and a shield.  Ariz. Att'y Gen. Op. No. I99-006 at n.4.

There is no historical practice of Bible recitations at public school-board meetings. And Ms. Rooks's reliance on *Kennedy* for anything more than the governing test is misguided; *Kennedy* is factually distinguishable.

### 1. There is no historical practice of religious invocations at public school board meetings.

Ms. Rooks's recitals at Board meetings fail to satisfy *Kennedy*'s historical practices and understandings test for three reasons. First, public schools did not exist at the time of the founding. Thus, religious invocations at school board meetings were not contemplated by the Founders when enacting the First Amendment.  Second, there *is* a historical practice of prohibiting religious invocations in public school settings because of its unique coercive effect.  Finally, school board religious invocations are different than legislative prayer.

### i. Public schools did not exist at the founding.

The Supreme Court recognized that the "historical approach is not useful in determining the proper roles of church and state in public schools, since free public education was virtually nonexistent at the time the Constitution was adopted." *Edwards v. Aguillard*, 482 U.S. 578, 583 n.4 (1987) (citation omitted). "The simple truth is that free public education was virtually nonexistent in the late 18th century." *Wallace v. Jaffree*, 472 U.S. 38, 80 (1985) (O'Connor, J., concurring). "Even at the time of adoption of the Fourteenth Amendment, education in Southern States was still primarily in private hands, and the movement toward free public schools supported by general taxation had not taken hold." *Id.*

 "In the colonial and early republic periods, there was no such thing as public education in the modern sense." Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2171 (2003). There was virtually no state involvement, and the term "'public' meant only that schools were open to the general public." *Id.* Schools were taught by the local minister, and the curriculum was embedded with religion. *Id.* "Even when the state

became more involved, there was no sharp distinction between public and private, religious and secular schools, until well into the nineteenth century." *Id.*

Without public education, there were no public-school boards, let alone religious invocations at school board meetings. A practice cannot faithfully reflect the Founding Fathers' era when it did not exist. *See Freedom From Religion Found., Inc. v. Chino Valley Unified Sch. Dist. Bd. of Ed.*, 896 F.3d 1132, 1148 (9th Cir. 2018) (recognizing school board prayer cannot be "'accepted by the Framers' when it did not exist at that time" (internal citation omitted)). Ms. Rooks's argument that 19th-century school boards had opening prayers (Doc. 34 at 16:14-22) merely identifies that religious organizations followed religious practices. And those practices are inapposite to what we now know as public education.

### ii. Coercive religious practice in public school settings violates the Establishment Clause.

Moving beyond the lack of historical analogue for true public education, courts and legislatures routinely prohibit religious practices in public school settings because of the coercive effect on students. Bible recitations and prayers in public school settings violate the Establishment Clause. *See Engel v. Vitale*, 370 U.S. 421, 424-25 (1962) (school prayer violated Establishment Clause); *Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 223 (1963) (school Bible recitations violated Establishment Clause); *Wallace*, 472 U.S. at 59-61 (state statute requiring school prayer violated Establishment Clause); *Lee v. Weisman*, 505 U.S. 577, 592-94 (1992) (prayer at high school graduation violated Establishment Clause); *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 294 (2000) (prayer at football game violated Establishment Clause). The Court recognized that there are "heightened concerns with protecting freedom of conscience from subtle coercive pressure" when students are present. *Lee*, 505 U.S. at 592. In *Kennedy*, the Court reiterated that coercive religious practice "was among the foremost hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." 597 U.S. at 537.

The Arizona Constitution also reflects a historical practice of keeping religion separate from taxpayer-funded schools in the late-19th and early-20th centuries. *See* Ariz. Const. art. II, § 12 ("No public money or property shall be appropriated for or applied to any religious worship, exercise, or instruction, or to the support of any religious establishment."); art. IX, § 10 ("No tax shall be laid or appropriation of public money made in aid of any church, or private or sectarian school, or any public service corporation."); art. XI, § 7 ("No sectarian instruction shall be imparted in any school or state educational institution that may be established under this Constitution").

The Ninth Circuit considered this very issue—whether a school board religious invocation violated the Establishment Clause—in 2018 in *Chino Valley*. Ms. Rooks cites *Chino Valley* once in a footnote (Doc. 34 at 13 n.2), arguing that it is inapplicable because it relied on the previous Establishment Clause analysis under *Lemon v. Kurtzman*, 403 U.S. 602 (1971). Although *Chino Valley* was a pre-*Kennedy* case, it applied *Kennedy*'s historical practices and understandings test, finding there was no historical practice of school board prayer. *Chino Valley*, 896 F.3d at 1148. This precedent controls.

That school board allowed clergy from any religion to pray at the beginning of the open school board meeting. *Id.* at 1139–40. A student representative attended every meeting and other students often attended for awards and recognition. *Id.* at 1139. Applying the historical practices and understandings test, the Court held that school board prayer did not fall within the legislative-prayer tradition. *Id.* at 1148. The Court emphasized that school board prayers typically take place before students whose "attendance is not truly voluntary," whose relationship with the board is not one of full parity, and who are more susceptible to indoctrination and peer pressure than adults. *Id.* at 1142. School board prayer was not a practice the Framers understood as consistent with the Establishment Clause because free public education did not exist at the founding. *Id.* at 1147–48 (citing *Aguillard*, 482 U.S. at 583 n.4). Thus, school board prayer could not have been contemplated. *Id.*

1      Ms. Rook's authority from the Fifth Circuit is an outlier. Every other circuit to

2 consider the issue agrees that there is no historical practice of school board prayer. *See*

3 *Coles ex rel. Coles v. Cleveland Bd. of Educ.*, 171 F.3d 369, 382 (6th Cir. 1999) ("[T]he

4 tradition supporting legislative prayer is keyed to its particular historical setting, a

5 historical setting not present in the context of a school board."); *Doe v. Indian River Sch.*

6 *Dist.*, 653 F.3d 256, 280-81 (3d Cir. 2011) (historical practice of legislative prayer

7 inapplicable to school board prayer).

8      Even Ms. Rooks's sole, chosen authority from outside the Ninth Circuit

9 recognized that school board prayer did not date back to the founding because "free public

10 education was virtually nonexistent at the time." *Am. Humanist Ass'n v. McCarty*, 851

11 F.3d 521, 527 (5th Cir. 2017) (quoting *Aguillard*, 482 U.S. at 583 n.4).

12      *McCarty* is also factually distinguishable. There, the school board randomly

13 selected *students* from a list of volunteers to deliver a one-minute expression *during the*

14 *ceremonial portion of school board meetings*. *Id.* at 524. Students often chose to include

15 religious invocations in their expressions. *Id.* In holding that the invocations did not

16 violate the Establishment Clause, the court emphasized that the prayers were delivered

17 by student volunteers during the opening, ceremonial phase of the meeting, the principal

18 audience of the invocations were the board members, and students were not required to

19 attend meetings. *Id.* at 528.

20      Here, Ms. Rooks is not a student reciting a religious invocation as an audience

21 member before the meeting begins. Rather, she is a Board member reciting the Bible

22 from the dais during the Board Comments portion of meetings, and her comments were

23 aimed at the audience. There is no rotation of students free to express whatever they want

24 with the allotted time—it is just Ms. Rooks and her recitals. Her recitals are also not

25 during the ceremonial portion of meetings; Board Comments usually occur after awards

26 and recognition but before public comment—long after the opening exercises.[13]

27 _____

28 [13] *See, e.g.*, Ex. 1 at PUSD-Rooks_0000012; Ex. 3 at PUSD-Rooks_000107-09; Ex. 5 at
PUSD-Rooks_000021-22; Ex. 7 at PUSD-Rooks_000037, 39-40; Ex. 9 at PUSD-

The timing of Ms. Rooks's recitals is irreconcilable with "fortify[ing]" herself to perform her duties, as she contends (Doc. 34 at 7).  [Doc. 1 ¶ 52.]  If that were her intended purpose, she would recite the Bible before her duties began, not in the middle of Board meetings. Moreover, if Ms. Rooks was the principal audience of her recitals, it would not matter if she said them quietly to herself during the meeting or before the meeting began. Instead, she broadcasts her recitals in the middle of meetings. In doing so, Ms. Rooks intends for all meeting attendees (including students and people needing to do business before the Board) to hear her recitals from her position of authority, just like the rest of her Board Comments.

In sum, there is no historical practice of religious invocations in public school settings under the *Kennedy* analysis.  Instead, the Arizona Constitution and decisions by the Supreme Court and majority of circuit courts reflect a history of preventing Bible recitations and prayer in public school settings.

### iii.    Ms. Rooks's recitations are not like legislative prayer.

Ms. Rooks focuses her analysis on the historical practice of invocations in the legislative, judicial, and executive branches (Doc. 34 at 12-18), analogizing those bodies to school boards. [Doc. 1 ¶¶ 50-51.]  But as discussed above, there is no comparable historical practice of school board religious recitations.

Although school boards and legislatures are both deliberative bodies, the similarities end there. In the legislative prayer cases, the Supreme Court emphasized that the prayers occurred in front of "mature adults, who 'presumably' are 'not readily susceptible to religious indoctrination or peer pressure.'" *See Town of Greece* 572 U.S. at 590 (quoting *Marsh v. Chambers*, 463 U.S. 783, 792 (1983)).  Here, the record shows that students are not just present at school board meetings, they are *actively involved* in the discussions. [*See, e.g.*, Ex. 12 at PUSD-Rooks_000207-08; Ex. 14 at PUSD-Rooks

---

Rooks_000065, 69; Ex. 11 at PUSD-Rooks_000145, 147-48; Ex. 13 at PUSD-Rooks_000185-86; Ex. 15 at PUSD-Rooks_000217, 219-20; Ex. 17 at PUSD-Rooks_000249-51; Ex. 19 at PUSD-Rooks_000285, 287-88; Ex. 21 at PUSD-Rooks_000323-325; Ex. 23 at PUSD-Rooks_000365, 368 (agenda excerpts).

000238-39; Ex. 16 at PUSD-Rooks_000273-74; Ex. 18 at PUSD-Rooks_000309, 312; Ex. 22 at PUSD-Rooks_000403 (excerpts of meeting minutes).] "School board meetings are therefore not the equivalent of galleries in a legislature where spectators are incidental to the work of the public body." *Coles*, 171 F.3d at 382.

Ms. Rooks also contends (Doc. 34 at 19 n.8) that the District failed to identify any students who were *required* to attend meetings where Ms. Rooks recited the Bible.  Citing *Town of Greece*, Ms. Rooks argues (Doc. 34 at 19 n.8) that freedom to attend meetings shows there was no "impermissible coercion."  572 U.S. at 590.  That assertion is, at best, misleading. The Board specifically invites students to attend meetings to receive awards and recognition. [Ex. 28 at 7:4-8.] Even if student attendance is not *required*, students *are* present at most Board meetings, including at the Board's invitation.[14]

Student attendance at Board meetings is not surprising. The Board exists to set policies for the students. [Ex. 30 (Manual § BBA).] Unlike other constituencies, students cannot vote members out if they disagree with the Board's polices.  Students' participation in Board meetings is *how* they voice their concerns about policies affecting them. "Thus, while such meetings may technically be 'voluntary,' in practice they are not." *Indian River Sch. Dist.*, 653 F.3d at 279. "[M]any members of the audience—and active participants in the meetings—are children and adolescents whose attendance is not truly voluntary and whose relationship with the Board is unequal." *Chino Valley*, 896 F.3d at 1145.).

Ms. Rooks also contends (Doc. 34 at 19) that her recitals were not coercive because she did not ask anyone to participate. But students were forced to choose between compelled religious practice or participation in school board meetings. "The Constitution . . . demands that the school may not force this difficult choice upon these students for "[i]t is a tenet of the First Amendment that the State cannot require one of its citizens to

---

[14] *See, e.g.*, Ex. 6 at PUSD-Rooks_000057; Ex. 8 at PUSD-Rooks_000096; Ex. 10 at PUSD-Rooks_001171; Ex. 12 at PUSD-Rooks_000207-08; Ex. 14 at PUSD-Rooks_000238; Ex. 16 at PUSD-Rooks_000273-74; Ex. 18 at PUSD-Rooks_000309, 312; Ex. 22 at PUSD-Rooks_000403 (meeting excerpts).

forfeit his or her rights and benefits as the price of resisting conformance to state-sponsored religious practice." *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 312 (quoting *Lee*, 505 U.S. at 596). Ms. Rooks's recitals bear the hallmarks of coercive religious practice that the Framers sought to prohibit. *See Kennedy*, 597 U.S. at 537.

Ms. Rooks's analogy (Doc. 34 at 18) to the Arizona legislature and Peoria City Council does not change the outcome. [Doc. 1 ¶ 51.] These are not school boards. Those invocations also (1) take place in the ceremonial portion of the meeting, (2) are not given by elected officials from the dais, and (3) rotate among different chaplains. *See Kotterman v. Killian*, 193 Ariz. 273, 290 ¶ 58 (1999) [Ex. 25 at 2; Ex. 26 at 3 (Peoria City Council Minutes).].

Ms. Rooks's scripture recitals during the Board Comments portion of meetings are not "the sort of solemnizing and unifying prayer, directed at lawmakers themselves and conducted before an audience of mature adults free from coercive pressures to participate, that the legislative-prayer tradition contemplates." *Chino Valley*, 896 F.3d at 1142; *accord Indian River Sch. Dist.*, 653 F.3d at 276-77 (student attendance at board meetings for awards, recognition, and student government bear the markings of "involuntariness" and "implied coercion").

### 2.    The facts of *Kennedy* are distinguishable.

Ms. Rooks argues (Doc. 34 at 19 n.2) that it does not matter whether students may have been present during her recitals because there is a "long constitutional tradition under which learning how to tolerate diverse expressive activities has always been 'part of learning how to live in a pluralistic society.'" *Kennedy*, 597 U.S. at 541. Ms. Rooks misreads *Kennedy*.

In *Kennedy*, a school district punished an assistant football coach for silently praying on the field after his employment duties ended. *Id.* at 518-20. The school district argued that *any* visible religious conduct by a school official is impermissibly coercive on students and violates the Establishment Clause. *Id.* at 540.

The Supreme Court rejected this proposition and held that the coach's prayers did not pose Establishment Clause concerns because they were "quiet, postgame prayers," and "not a single Bremerton student joined." *Id.* at 539. In other words, the prayers occurred when coaches were permitted to attend to personal matters and "were not publicly broadcast or recited to a captive audience." *Id.* at 525-26, 542. The Court distinguished the coach's prayers from those that were publicly broadcast at high school graduation or football games where student attendance and participation were practically compelled. *Id.* at 541-42 (citing *Lee*, 505 U.S. at 580; *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 294). The coach's private, silent prayers lacked the religious coercion the "framers sought to prohibit when they adopted the First Amendment." *Kennedy,* 597 U.S. at 537.

Ms. Rooks's scripture recitals are nothing like the coach's prayers in *Kennedy*. Her recitals were not quiet, personal, or on her own time. Ms. Rooks recited the Bible from the dais in the middle of Board meetings. Her recitals were also broadcast to a captive audience—students who interacted with the Board by attending meetings.

The District is not concerned about "phantom constitutional violations," as Ms. Rooks contends (Doc. 34 at 11-12). Ms. Rooks's recitals violate the Establishment Clause. She fails to meet her burden on this claim.

### B. Ms. Rooks fails to establish facts showing any violation of her free speech rights under the First Amendment.

In Count 3, Ms. Rooks contends that the District's alleged "official policy and actions" "regulate her speech based on its content, message, and viewpoint." [Doc. 1 ¶ 58.] She surmises that the District's "official policy and actions" "chill her ability to freely speak" in violation of the First Amendment. [*Id.*]

Elected officials have latitude in their speech. But the Supreme Court "has rejected the notion that the First Amendment confers a right to use governmental mechanics to convey a message." *Nev. Comm'm on Ethics v. Carrigan*, 564 U.S. 117, 127 (2011). Any official action as a *Board* member while performing *Board* duties is an exercise of *Board* powers; it is not Ms. Rooks's personal speech entitled to First Amendment protection.

1     *See Linthicum v. Wagner*, 94 F.4th 887, 892 (9th Cir. 2024) (state legislators' walkout to

2     prevent quorum not entitled to First Amendment protection).

3         Ms. Rooks must show: "(1) [s]he engaged in constitutionally protected activity;

4     (2) as a result, [s]he was subjected to adverse action by the defendant that would chill a

5     person of ordinary firmness from continuing to engage in the protected activity; and

6     (3) there was a substantial causal relationship between the constitutionally protected

7     activity and the adverse action." *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir.

8     2010).  She cannot meet that burden.

9         An adverse action against an elected official is material when it prevents the

10    elected official from doing her job, deprives her of authority earned by virtue of popular

11    election, or otherwise prevents her from enjoying "the full range of rights and

12    prerogatives that came with having been publicly elected." *Id.* at 544-45 & n.4; *accord*

13    *Houston Cnty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022). But verbal censure is not a

14    materially adverse action.  *Wilson*, 595 U.S. at 478-79.

15        Ms. Rooks never experienced *any* material adverse action. There is no evidence

16    that the District prevented or impeded her from acting as a Board member, deprived her

17    of any authority, or inhibited any other "rights and prerogatives" of an elected official.

18    *Blair,* 608 F.3d at 544.  Nor could the alleged "policy and actions" do so.  A memorandum

19    from the Board's counsel offering a legal opinion, or a spoken reminder from the Board

20    President, do not constitute official "policy," so they cannot affect Ms. Rooks's office,

21    authority, or other rights.  Rather, Ms. Rooks stopped reciting Bible verses during Board

22    meetings on her own volition after assessing the risks, particularly of her personal liability

23    if SCA or FFRF sued. [Doc. 1 ¶ 40.]

24        Even if the opinion of the Board's legal counsel were a "policy" (it is not), the

25    "policy" is viewpoint neutral.  In designated public fora, "the government may impose

26    reasonable time, place, and manner restrictions on speech, but content-based restrictions

27    must be viewpoint neutral and satisfy strict scrutiny review." *Koala v. Khosla*, 931 F.3d

28    887, 900 (9th Cir. 2019).

Ms. Rooks argues that the District's supposed policy is impermissible viewpoint or content discrimination because it requires that she "not read scripture" or "offer bible verses." [Doc. 1 ¶ 58; Doc. 34 at 22:8-17.] But Ms. Rooks cannot deny that the agenda for *every* Board meeting tells the public that Board Comments are "for Board members to publicly recognize schools, groups, or individuals who have made a contribution to the district, as well as share information related to their service as Board members."[15]  She hopes to use the portions of Board meeting limited to those topics to instead tell a captive audience about her unrelated religious beliefs. The "policy" applies not only to Ms. Rooks's Bible recitations; it applies to all speech during the Board Comments that could violate the Establishment Clause or OML. [*See generally* Docs. 1-2, 1-3.]

Ms. Rooks does not contend, much less show, that the District lets other Board members routinely engage in personal speech (religious or otherwise) during the Board Comments. Instead, Ms. Rooks suggests that at *one meeting* in August 2022, a Board member referred to a TED Talk about working together and, at *one meeting* in February 2021, the Board President mentioned his role as a pronouncer for the regional spelling bee. [Doc. 34 at 8:21-9:9]

Unlike Ms. Rooks's regular scripture recitals, however, those comments summarized current District events under the OML. But even if they did not, such instances were isolated, one-time comments; no one challenged the remarks or prompted a legal review. [Ex. 27 ¶ 8 .]  In contrast, Ms. Rooks recited scripture 10 times and received at least three formal complaints containing legal analyses, threatening legal exposure, and prompting the Board to seek a legal opinion from its own counsel. The District had no reason to address single passing comments that did not prompt litigation threats and that appeared to fall directly within the current-events exception of the OML.

---

[15] *See* Ex. 1 at PUSD-Rooks_000002; Ex. 3 at PUSD-Rooks_000108; Ex. 5 at PUSD-Rooks_000022; Ex. 7 at PUSD-Rooks_000039-40; Ex. 9 at PUSD-Rooks_000069; Ex. 11 at PUSD-Rooks_000147-48; Ex. 13 at PUSD-Rooks_000186; Ex. 15 at PUSD-Rooks_000219-20; Ex. 17 at PUSD-Rooks_000250-51; Ex. 19 at PUSD-Rooks_000287-88; Ex. 21 at PUSD-Rooks_000324-25; Ex. 23 at PUSD-Rooks_000368.

Moreover, the alleged "policy" is a reasonable time, place, and manner restriction. Nothing the District said prevents Ms. Rooks from reciting scripture before or after meetings or even quietly to herself during meetings.

Even if the communications comprising the alleged "policy"—counsel's advice and Board President's reminder—are not viewpoint neutral, the "policy" is narrowly tailored to serve a compelling interest. The District has a compelling interest ensuring the Board follows the law. The Establishment Clause prohibits coercive religious practices in public school settings. [*See* Argument § III.A.1.] And the OML prevents Board members from addressing topics not included on the agenda, with a narrow exception for a "brief summary of current events." A.R.S. § 38-431.02(H), (K). [*See* Argument § II.A.] Complying with the law is a sufficiently compelling interest to justify a content-based restriction. *Cap. Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 761–62 (1995) (finding compliance with law is an interest sufficiently compelling to justify content-based restrictions); *accord Walker v. Beard*, 789 F.3d 1125, 1136 (9th Cir. 2015) (same).

Here, the Board's legal counsel and the Board President went no further than necessary to ensure that Board members refrain from personal and religious speech to discuss only what is on the agenda; that is, to comply with the Establishment Clause and OML. [*See* Doc. 1-6 at 3.] Ms. Rooks did not meet her burden of proving her free speech claim.

**C.      Ms. Rooks fails to show any violation of Arizona's Free Speech Clause.**

In Count 6, Ms. Rooks contends that the District's alleged "direction" that she should "'not read scripture' or 'offer bible verses' regulates [her] speech based on its message, content, and viewpoint," in violation of Arizona's Free Speech Clause (Ariz. Const. art. II, § 6). [Doc. 1 ¶ 75.]  Ms. Rooks concedes (Doc. 34 at 24:18-21) that the analysis for her claim under the Arizona Free Speech Clause is the same as the analysis under the First Amendment. *See, e.g.*, *Brush & Nib Studio, LC v. City of Phx.*, 247 Ariz. 269, 281-82 ¶¶ 45–47 (2019) (analyzing Free Speech Clause argument by referring to First Amendment).  Ms. Rooks argues, however, that the Arizona Constitution "provides

30

1    broader protections for free speech than the First Amendment" in two material ways.  *Id.*
2    at 281 ¶ 45. [Doc. 34 at 25:1-7.]

3         First, citing *Mountain States Telephone & Telegraph Co. v. Arizona Corporation*
4    *Commission*, 160 Ariz. 350 (1989), Ms. Rooks contends that under Arizona law,
5    restrictions on free speech must be drawn with "narrow specificity." *Id.* at 358. [Doc. 34
6    at 24:8-11.] She contends that the District's concerns about violating the Establishment
7    Clause and OML are overbroad. [*Id.* at 24:11-14] Ms. Rooks does not expand on her
8    argument.  Instead, she references her First Amendment analysis, suggesting the standard
9    under the Arizona Constitution is the same. [*Id.*]

10        Although Arizona's Free Speech Clause has been recognized by the courts as
11   broader than the First Amendment, no court has defined the scope of the difference. *Brush*
12   *& Nib Studio*, 247 Ariz. at 281-82 ¶¶ 45-46; *Salib v. City of Mesa*, 212 Ariz. 446, 454 ¶
13   24 (App. 2006). Indeed, the court in *Mountain States Telephone & Telegraph* determined
14   that the "narrow specificity" requirement is the same under the First Amendment and the
15   "more stringent protections of the Arizona Constitution." 160 Ariz. at 358. The District's
16   purported "policy" is viewpoint neutral and sufficiently narrow under Arizona law for the
17   same reasons under the First Amendment. [*See* Argument § III.B.]

18        Ms. Rooks also argues (Doc. 34 at 24:15-21) that any limit on her speech is an
19   unconstitutional prior restraint, and she can only be held responsible for abusing
20   Arizona's Free Speech Clause after-the-fact. But this position cannot be reconciled with
21   Arizona law, including cases cited by Ms. Rooks, recognizing that time, place, and
22   manner restrictions are permissible. *See Mountain States Tel. & Tel.*, 160 Ariz. at 358
23   (government "may impose content-neutral, reasonable time, place, and manner
24   regulations"); *Salib*, 212 Ariz. at 454 ¶ 24 (same).  The alleged "policy" is also not a prior
25   restraint. Ms. Rooks recited scripture 10 times. The District responded to Ms. Rooks's
26   recitals after complaints from outside entities, and she chose to stop reciting the Bible on
27   her own volition.

28

1         **D.**     **Ms. Rooks's free exercise claims lack necessary proof.**

2        In Counts 4 and 5, Ms. Rooks alleges that the District "substantially burden[ed]

3 her religious exercise." [Doc. 1 ¶¶ 64, 69.]  In her view, the District's "direction that

4 Rooks stop reciting scripture at Board meetings" violates her First Amendment right to

5 free exercise of religion and Arizona's FERA because the District's "actions don't serve

6 a compelling government interest and aren't the least restrictive means of furthering any

7 purported compelling interest." [Doc. 1 ¶¶ 62-65, 68-70.]

8
9            **1.**     **Deficiencies common to Counts 4 and 5—the "policy" is neutral and serves a compelling interest.**

10        "[A] law that is neutral and of general applicability need not be justified by a

11 compelling governmental interest even if the law has the incidental effect of burdening a

12 particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,

13 508 U.S. 520, 531 (1993). The Court has "never held that an individual's religious beliefs

14 excuse him from compliance with an otherwise valid law prohibiting conduct that the

15 State is free to regulate." *Emp. Div., Dep't. of Hum. Res. of Or. v. Smith*, 494 U.S. 872,

16 878-79 (1990).  A plaintiff carries her burden on a Free Exercise Claim by showing that

17 the government's policy is not neutral or generally applicable. *Id.* at 879–81.  Ms. Rooks

18 did neither.

19        A government policy is not neutral, however, if it discriminates on its face or

20 targets religious practices. *Church of Lukumi Babalu Aye*, 508 U.S. at 532-34.  And "[a]

21 government policy will fail the general applicability requirement if it 'prohibits religious

22 conduct while permitting secular conduct that undermines the government's asserted

23 interests in a similar way,' or if it provides 'a mechanism for individualized exemptions.'"

24 *Kennedy*, 597 U.S. at 526 (quoting *Fulton v. City of Phila. Pa.*, 593 U.S. 522, 533-34

25 (2021)).  Failing either the neutral or general applicability tests trigger strict scrutiny.  *Id.*

26 But the District's alleged "policy" is both neutral and generally applicable.

27        The supposed "policy" is neutral under the Free Exercise Clause for the same

28 reasons it is viewpoint and content neutral under the Free Speech Clauses. [*See* Argument

§ III.B-C.]  On its face, and as posited by Ms. Rooks, the District's alleged "policy" is not to prevent Ms. Rooks from reciting the Bible at meetings.  Rather, it is to ensure the Board follows the Establishment Clause and OML. To meet those goals, the "policy" limits all personal speech not on the official meeting agenda. The ostensible "policy" is also generally applicable under the Free Exercise Clause—it applies equally to all Board members for religious and non-religious speech.

Because the purported "policy" is neutral and generally applicable, rational basis review applies.  *Smith*, 494 U.S. at 878–79.  Under that standard, a policy does not violate the Free Exercise Clause if it is rationally related to a legitimate government interest.  *Id.* The District has a legitimate interest in complying with the law to limit the risk of fines, fees, and other punishment for Board members violating the Establishment Clause or OML.

Likewise, the District's interest in following the Establishment Clause and the OML is rationally related to limiting all religious and non-religious speech during the Board Comments portion of the meeting. "[C]ompliance with the Establishment Clause is a state interest sufficiently compelling to justify content-based restrictions on speech." *Cap. Square Review*, 515 U.S. at 761–62.  After all, "[c]ompliance with the Constitution can be a compelling state interest."  *Walker*, 789 F.3d at 1136.

The record shows that the District's purported "policy" is neutral, generally applicable, and able to withstand rational basis review.  It "prohibits" members from engaging in religious or personal speech during the Board Comments portion of the meeting to avoid Establishment Clause and OML violations. Accordingly, Ms. Rooks fails to meet her burden.

### 2.   Additional reasons the Arizona Free Exercise of Religion Act (Count 5) fails.

Count 5 hinges on the Arizona Free Exercise of Religion Act (A.R.S. § 41-1493.01). The putative FERA claim requires Ms. Rooks show her acts are motivated by a sincerely held religious belief and that the District's "regulation" substantially burdens

the free exercise of her beliefs.  *Brush & Nib Studio*, 247 Ariz. at 297 ¶ 127.  Ms. Rooks argues that District substantially burdened her free exercise by disrupting her remarks and pressuring her to stop reciting scripture. [Doc. 34 at 29:3-5.]

FERA requires a plaintiff show the government imposed a substantial burden on that plaintiff's religious exercise. "[A] substantial burden exists only when government action 'forces' individuals 'to choose between following the precepts of [their] religion' and receiving a government benefit, or it 'compels them, under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs.'"  *Brush & Nib Studio*, 247 Ariz. at 298 ¶ 131 (citations omitted).  Ms. Rooks must show a government policy or decision coerced her to act contrary to her religion by imposing a penalty or denying a benefit.  And "trivial, technical or de minimis infractions" are not a substantial burden.  A.R.S. § 41-1493.01(E).

Here, the District has not imposed a regulation that could burden Ms. Rooks's exercise of her beliefs.  At most, the Board received advice from its legal counsel. And if there were a regulation, there is no substantial burden.  The substantial burden analysis turns on whether the challenged regulation imposes a penalty or denies a government benefit for noncompliance. *Brush & Nib Studio*, 247 Ariz. at 298 ¶ 131. There is no penalty or benefit denial here.

For example, the *Brush & Nib* plaintiffs faced criminal penalties, including up to six months in jail for each violation of city ordinance.  *Id.* at 299 ¶ 135.  "[I]if Plaintiffs post their proposed Statement on their website for a month, [the Plaintiffs] could face up to *fifteen years* in jail."  *Id.*  The civil penalties ranged to "tens of thousands of dollars." *Id.* Those plaintiffs could only avoid those penalties by creating custom handmade artwork conveying messages contrary to their religious beliefs. "This is the very definition of a substantial burden."  *Id.* at 301 ¶ 145.

Ms. Rooks has always been able to recite scripture before or after Board meetings or even quietly to herself during meetings.  Nothing has compelled her to act contrary to her beliefs (such as create custom wedding invitations for same-sex weddings seen in

1   *Brush & Nib*).  Ultimately, Ms. Rooks's FERA claim attempts to fit a square peg into a

2   round hole.  The District is not aware of, and Ms. Rooks did not cite, any case applying

3   it to such a situation.

4                                   **Relief Requested**

5          For the foregoing reasons, the District respectfully asks the Court to grant

6   summary judgment in its favor and to deny Plaintiff's motion.

7          DATED this 11th day of April, 2024.

8                                   OSBORN MALEDON, P.A.

9

10                                  By  s/Sarah P. Lawson
                                        James D. Smith
11                                      David D. Garner
                                        Sarah P. Lawson
12                                      Alexandria N. Karpurk
                                        2929 North Central Avenue, Suite 2000
13                                      Phoenix, Arizona 85012

14                                  Attorneys for Defendant

15                          **CERTIFICATE OF SERVICE**

16         I hereby certify that on April 11, 2024, I electronically transmitted the attached

17  document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

18  Notice of Electronic Filing to all CM/ECF registrants.

19         I hereby certify that on April 11, 2024, I served the attached document by first-

20  class mail on the Honorable Michael T. Liburdi, United States District Court, Sandra Day

21  O'Connor U.S. Courthouse, Suite 524, 401 West Washington Street, SPC 57, Phoenix,

22  Arizona 85003-2156.

23

24

25                                  s/Karen McClain

26  10315229

27

28