James D. Smith, 016760
David D. Garner, 020459
Sarah P. Lawson, 036436
Alexandria N. Karpurk, 037029
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2000
Phoenix, Arizona 85012
602-640-9000
jsmith@omlaw.com
dgarner@omlaw.com
slawson@omlaw.com
akarpurk@omlaw.com

Attorneys for Defendant

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Heather Rooks,<br><br>                    Plaintiff,<br><br>        v.<br><br>Peoria Unified School District,<br><br>                    Defendant. | No. CV-23-02028-PHX-MTL<br><br>DEFENDANT'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT |

Ms. Rooks's standing argument rests on the untenable propositions that: (a) receiving legal advice from the Board's attorney confers Article III standing to challenge any law on which the attorney offers an opinion, and (b) such standing permits suit against the District—which did not take or threaten any adverse action against Ms. Rooks but only reminded the Board that *other entities* may seek to sue the District.  There should be no doubt that Ms. Rooks lacks Article III standing.

While the standing argument is dispositive, Ms. Rooks's counterarguments on the merits are likewise untenable.  Relying on the erroneous notion that the District implemented a "policy" to selectively target and prevent her religious speech, she ignores that the purported "policy" (*i.e.*, Board counsel's legal advice) applied to *all* speech by *all* Board members.  Once this erroneous factual predicate is removed, Ms. Rooks's argument that scripture recitals from the dais during Board meetings must be permitted similarly crumbles.  The Court should grant the District's motion.

## I.    This Court lacks jurisdiction because there is no case or controversy.

Our federal courts cannot decide cases in which the plaintiff lacks: (1) a "concrete and particularized" *injury in fact* that is (2) causally connected to the *defendant's* conduct and (3) can be *redressed* by a favorable decision.  *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560 (1992); *accord Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1174 (9th Cir. 2022).  Ms. Rooks cannot satisfy these bedrock elements of standing.

### A.    Under applicable law, Ms. Rooks fails to show an injury-in-fact sufficient to invoke this Court's jurisdiction for a pre- or post-enforcement claim.

Ms. Rooks lacks the most basic component of standing: she has not suffered any "injury in fact."  To have standing in a pre-enforcement context, a plaintiff must show (1) "a concrete plan to *violate the law* in question," (2) "*prosecuting authorities* have communicated a specific warning or threat to initiate proceedings," and (3) a "history of *past prosecution or enforcement*."  *Alaska Right to Life Pol. Action Comm. v. Feldman*, 504 F.3d 840, 849 (9th Cir. 2007) (citation omitted) (emphasis added).  Ms. Rooks ignores the import of this binding precedent and fails each of its three prongs:

- She identifies no "law" imposed by the District that she intends to violate;
- She identifies no prosecuting authorities in this litigation that have conveyed a warning or threat to initiate proceedings against her concerning such phantom "law"; and
- She has shown no history of past prosecution or enforcement of any such nonexistent "law."

Instead, Ms. Rooks asserts (at 9) that she "[s]elf-censor[ed] in response to a credible threat."[1]  A credible threat of what?  Self-censorship only creates standing where "it is based on an actual and well-founded fear that the challenged statute will be enforced."  *Libertarian Party of L.A. Cnty. v. Bowen*, 709 F.3d 867, 870 (quoting *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1001 (9th Cir. 2010)) (plaintiffs had standing because they had concrete plan to violate an election law carrying criminal penalties and had been warned by a prosecuting authority).

There is nothing to enforce here, much less a threat to enforce that nothingness. The District has not enacted any rule, regulation, or policy that could violate Ms. Rooks's First Amendment rights.  The statements that she challenges—an email from the Board's legal counsel giving legal advice, an email from the Board's executive assistant to the Board summarizing that legal advice, a memorandum from the Superintendent restating the legal advice, and a statement from the Board President reminding members of the legal advice—do not constitute a "policy" of the District.

Relying on *OSU Student Alliance v. Ray*, Ms. Rooks attempts (at 16) to sidestep the first standing prong by arguing she was harmed by an "unwritten" policy that "the District implemented and enforced" against her.  But apprising and reminding the Board of legal advice from the Board's legal counsel simply is not policy.  Sharing that advice is not "enforcement" of anything.  *Am. C.L. Union v. Nat'l Sec. Agency*, 925 F.3d 576, 583 (2d Cir. 2019) (defining boundary between "laws and policies that bind our government and its agencies" and "confidential legal advice").

---

[1] Citations to earlier filings are to blue ECF page numbers in the documents' headers.

At most, the communications here reflected non-binding guidance to Board members on how to avoid possible future legal liability. Such advice is, by definition, unenforceable and without legal effect; clients are always free to accept or reject advice. As such, Ms. Rooks remained free to ignore—and in fact did ignore—the offered guidance. But she cannot face a "credible threat" of "enforcement" of non-binding advice.[2] *Alaska Right to Life Pol. Action Comm.*, 504 F.3d at 849-50 (holding that a plaintiff lacks standing to bring a pre-enforcement challenge where the defendant issues "informal guidance" with "no legal effect," and has not contemplated enforcement). Here, Ms. Rooks failed to identify any actions that *the District* could take against her if she "fail[s] to comply" with legal advice offered by the Board's legal counsel. *Brodheim v. Cry*, 584 F.3d 1262, 1270 (9th Cir. 2009).

Ms. Rooks's own cases confirm that dispensing legal advice is insufficient to "open" the door to Article III standing on self-censorship grounds. *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003) (discussing standing and self-censorship). For example, Ms. Rooks often cites (at 10, 12, 18, and 19) *Brodheim*, but those facts are nothing like this case. That plaintiff faced a credible threat because the defendant, a corrections officer, could have done "a number of things" if the plaintiff "failed to comply with his warning." *Brodheim*, 584 F.3d at 1270. Ms. Rooks does not identify any actions that the District could take against her if she "fail[s] to comply" with guidance offered by the Board's legal counsel. *Id.* Ms. Rooks's citation to *Tingley v. Ferguson* is distinguishable for the same reasons. 47 F.4th 1055, 1064, 1068 (9th Cir. 2022) (holding that plaintiff therapist faced a credible threat of professional discipline from defendants under the state's Uniform Disciplinary Act).

Ms. Rooks's claim (at 18) that she suffered "completed injuries-in-fact" creating post-enforcement standing likewise fails. The District never "threatened" Ms. Rooks. It

---

[2] While choosing to follow or ignore legal advice may lead to consequences, simply sharing legal advice does not constitute a "threat."

did not subject her to any adverse action, and it did not deprive her of any of the privileges of being a Board member.  Thus, she is not entitled to retrospective relief.

**B.      Ms. Rooks's cases underscore the lack of any threatened injury.**

Ms. Rooks's reliance (at 9-13) on cases finding self-censorship standing emphasizes the broad chasm between her claim and a viable one.  Unlike the "legal advice" here, each of the cases Ms. Rooks cites involved the threat of enforcement of actual criminal or civil penalties:

- *Libertarian Party of L.A. Cnty.*, 709 F.3d at 872 (threat of "criminal prosecution for perjury" or Elections Code);

- *Culinary Workers Union, Loc. 226 v. Del Papa*, 200 F.3d 614, 616 (9th Cir. 1999) (threat of "gross misdemeanor" with a penalty of a "fine[] or imprison[ment], or both");

- *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021) (government's threat to "initiate proceedings" coupled with history of "a number of prosecutions");

- *Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006-07 (9th Cir. 2003) (threat of "civil penalties for violation of the statute").

The District has not threatened to impose any civil or criminal penalty—nor does the District have any authority to do so.  Ms. Rooks does not point to any penalties that she faced or that the District threatened.  In fact, Ms. Rooks does not even identify what civil or criminal penalties the District *could* enforce against her, much less a "specific warning or threat."  *Alaska Right to Life Pol. Action Comm.*, 504 F.3d at 849.

Ms. Rooks's reliance on cases outside of the First Amendment context is similarly misplaced.  *See Societe de Conditionnement en Aluminium v. Hunter Eng'g Co.*, 655 F.2d 938, 944 (9th Cir. 1981) (considering standing in a suit to invalidate a patent); *Chesebrough-Pond's, Inc. v. Faberge, Inc.*, 666 F.2d 393, 396 (9th Cir. 1982) (considering standing in suit for trademark infringement).  In the First Amendment context, standing requires a concrete plan to violate a specific law, coupled with a "specific warning or threat to initiate proceedings," and a "history of past prosecution or

1    enforcement." *Alaska Right to Life Pol. Action Comm.*, 504 F.3d at 849.  As the District

2    established, Ms. Rooks fails on all three injury prongs.

3    **C.      Ms. Rooks's has failed to establish any causal connection between the District and any purported injury she may face from other entities/nonparties.**

4

5    Building on the flawed argument that the District made a "credible threat" to

6    "enforce" a nonexistent policy, Ms. Rooks argues (at 13) that complaints made by

7    Freedom From Religion Foundation ("FFRF") and Secular Coalition of Arizona ("SCA")

8    *against the District* somehow became threats *by the District* that confer standing for her

9    to sue the District.  [*See* Docs. 1-2, 1-4, 1-5.]  This shoot-the-messenger argument is

10   legally unsupportable.

11   Ms. Rooks's response uses variations of the term "threat" fifty-six times in her

12   brief.  But what did the District threaten to do?  Nothing.  The District neither suggested

13   nor implied that the District was contemplating any sort of "enforcement" against

14   Ms. Rooks.  After nearly 60 pages of briefing, Ms. Rooks has not identified any District

15   policy that the District purportedly threatened to enforce against her.  Rather,

16   administrators shared with the entire Board legal advice from the Board's lawyer.  There

17   is no threat of anything from the District.  The only possible threats came from FFRF and

18   SCA, but she chose not to sue them.  Simply acknowledging that such third-party threats

19   pose a potential risk to the District and reminding the Board of that risk is not a "threat"

20   of any kind.

21   Citing *Culinary Workers Union* (at 13), Ms. Rooks argues that the District cannot

22   "evade responsibility for its threats by pointing to the fact that it was responding to

23   threats" by the two groups.  Setting aside the factual *non sequitur* in Ms. Rooks's

24   statement,[3] the facts here could not be further removed from those in *Culinary Workers*

25   *Union*.  In that case, the court found a case or controversy "may exist" when the state

26   attorney general either enforces a statute creating criminal penalties or "encourage[s]

27

28   _____

[3] While seeking legal advice from one's attorney is a sensible response to a legal threat, labeling the advice received a "threat" makes no sense.

local law enforcement agencies to do so." 200 F.3d at 618 (citation and quotation marks omitted).  In contrast, the District has not created a policy with any sanctions, the District is not "enforcing" any such policy (even if one existed), and it is not encouraging local law enforcement—or FFRA, SCA, or anyone else—to do so.  *Id*.  Standing to sue the District cannot flow from third parties' letters threatening suit against the District.  Nor can it flow from an opinion from the Board's lawyer that such third-party claims may be viable.

Ms. Rooks next assumes (at 14) the District's inability to disavow that it will take an enforcement action as "strong evidence" of a "'credible threat' to take action" against her.  But just as the District has nothing to enforce, it has nothing to disavow.  The District has not made any policy banning Ms. Rooks's speech, and it has not—and cannot—disavow future enforcement of a policy that does not exist.

Finally, Ms. Rooks's request for an advisory opinion is an invitation to err.  Ms. Rooks seeks a declaratory judgment in Counts 1 and 2 that she is entitled to immunity for reading Bible verses or violations of the Establishment Clause.  [Doc. 1 ¶¶ 47, 54.]  With this request, Ms. Rooks seeks a ruling that she would not be liable in future suits brought by nonparties if she resumes reading scripture from the dais.  [*Id.*]  Such a ruling would not resolve any active case or controversy, but instead would constitute an advisory opinion on "a collateral legal issue . . . [in] pending or future suits."  *Calderon v. Ashmus*, 523 U.S. 740, 747 (1998).

**D.    The undisputed facts show that Ms. Rooks lacks standing.**

In a final effort to gin up a credible threat, Ms. Rooks misstates the record.  It is undisputed that Ms. Rooks recited Bible verses during the "Board Comments" portion (*i.e.*, current events summaries) at ten meetings between January 12 and June 22, 2023. [Doc. 1 ¶¶ 20-29.]   The Board received complaints from SCA and FFRF soon after Ms. Rooks began her recitations.  [Doc. 1-2, Doc. 1-4.]

The Board sought legal advice about those complaints. The Board's lawyer advised the entire Board of "[t]he risk to the District and to individual board members"

and opined that "it would be in the best interest of the District to cease offering bible verses at Board meetings." [Doc. 1-6 at 3.] The entire Board received a summary of that same lawyer's advice in an email from the Board's Executive Assistant: "In summary of the attorney's guidance, a board member acting in their role as such, should not read Scripture during a board meeting . . . ." [Doc. 1-3 at 2.] The District never threatened adverse action against Ms. Rooks in that communication (or elsewhere). [Docs. 1-3, 1-6.] Ms. Rooks mischaracterizes the evidence when suggesting otherwise.

Ms. Rooks initially complains (at 9) that the "District's letter" that "direct[ed] [her] to stop reciting Bible verses during School Board meetings" was what "caused her to self-censor." The purported "District's letter" was a letter from the Board's lawyer—not from the District. [Doc. 1-6.] And the "District official" who Ms. Rooks claims (at 10) sent her a "credible threat" was the Board's Executive Assistant. [Doc. 1-3.] To say the least, Ms. Rooks's descriptions are overreaching.

Moreover, Ms. Rooks inaccurately paints (at 12) this legal advice as "written warnings" of "credible threats of enforcement action." She also asserts (at 16) that the Executive Assistant's email and the Board President's statements in a March 9, 2023 meeting are an "exercise [of] the District's explicitly delegated authority." But legal advice cannot be a policy of the Board—it is neither approved nor voted on by the Board, and it certainly cannot bind the District, the Board, or any individual Board Member. *See Am. Civil Liberties Union*, 925 F.3d at 583.

Ms. Rooks next implies that the District's legal advice singled her out. She claims that "a District official and the District's attorney each *told Rooks*" to stop reciting Bible verses, "a District official *sent Rooks* written instructions," and "the District's attorney *wrote directly to Rooks*." [Doc. 41 at 10-11 (emphasis added).] Untrue. Each of these communications went to the entire Board. [Docs. 1-3, 1-6.]

Then, Ms. Rooks alleges (at 15) that she suffered an adverse action by the Board president "interrupt[ing] and criticiz[ing] her" during the March 9, 2023 meeting. But as the District stated in its motion—and Ms. Rooks does not dispute in her Response—

7

1   verbal censure is not a materially adverse action.  *Houston Cnty. Coll. Sys. v. Wilson*, 595

2   U.S. 468, 477 (2022).  If verbal censure does not constitute a justiciable injury, then

3   "interruption" certainly does not meet the standard.  An adverse action against an elected

4   official is only material when it prevents her from exercising her authority or "the full

5   range of rights and prerogatives that come with having been publicly elected."  *Blair v.*

6   *Bethel Sch. Dist.*, 608 F.3d 540, 544-45 & n.4.

7       Moreover, Ms. Rooks's scripture recital *was not actually interrupted*.  The video

8   of that meeting shows Ms. Rooks recited the entire verse and continued with her Board

9   comments for over two minutes.  The Board President finally interrupted when Ms. Rooks

10  turned to 2019 District materials she disapproved of.[4]  [*See* Doc. 44, March 9, 2023

11  Meeting Recording at 1:26:24 (recitation of the Bible verse, followed by recognition of

12  several schools, teachers, and students, then followed by discussion of a mental health

13  grant to bring social workers into schools and her thoughts on a social-emotional health

14  survey that was conducted in 2019), *id.* at 1:28:45 (Board President's statements), *id.* at

15  1:30:42 (Ms. Rooks declined to continue comments despite opportunity to do so).][5]

16      Ms. Rooks's theory (at 15)—raised for the first time in her response—is that she

17  suffered a cognizable injury because she "lost" "the time that was taken from" her Board

18  Comments.  No statute, rule, or policy guarantees Board Members a certain amount of

19  time for Board comments.  And in no way did the Board President's comments shorten

20  the time allotted to Ms. Rooks for her comments—she could have continued discussing

21  current events, as was properly noticed on the agenda, for as long as she wanted.  Thus,

22

23  [4] Ms. Rooks tries (at 18 n.8) to distinguish between the Board President's statements and
    her own, arguing that the Board President's comments are "attribut[able]" to the District
24  while her comments are "protected speech."  Ms. Rooks essentially asserts that speech
    from the dais is only official District speech when it suits her argument.  *Bond v. Floyd*,
25  385 U.S. 116, 136 (1966), does not stand for this proposition.  Rather, *Bond* concerned a
    legislator's statements on the Vietnam War during a telephone interview, not whether
26  speech from the dais is attributable to the governmental body.  *Id.* at 121.  Ms. Rooks
27  cannot have it both ways.
    [5] The District provided the Court with a USB drive with a video recording of this meeting.
28  [Doc. 44 (notice of lodging).]

8

1    Ms. Rooks doesn't allege that she lost any rights, powers, or privileges of being a Board

2    member, but rather hitches her entire complaint (at 15) to the fact that at one meeting for

3    one minute, she was "interrupted" and could not speak continuously.  Such ephemeral

4    slights are simply not enough to invoke this Court's jurisdiction.

5         In a last-ditch effort to manufacture standing, Ms. Rooks paints (at 15) the Board

6    President's interruption of her as a "threat of future enforcement."  Ms. Rooks's own

7    actions belie her assertion.  Ms. Rooks recited Bible verses at six meetings after March 9

8    without interruption or penalty.[6]  It is clear from Ms. Rooks's continued recitations that

9    the Board President's one-time reminder did not deter her conduct.

10        Both the facts and law show that Ms. Rooks's claims are jurisdictionally defective

11   which requires dismissal of Ms. Rooks's claims.

12   **II.    Ms. Rooks's scripture recitals from the dais violate the Open Meeting Law.**

13        Not only are Ms. Rooks's claims jurisdictionally defective, no constitutional

14   violation can flow from limiting Ms. Rooks's Board Comments to a "brief summary of

15   current events" as Arizona's Open Meeting Law ("OML") requires.  The OML has a

16   narrowly drawn exception to its agenda requirement that lets members of a public body

17   provide "a brief summary of current events" that are not specifically listed on the agenda.

18   A.R.S. § 38-431.02(K).  A summary of current events "consists merely of" a designated

19   person "summarizing recent occurrences without any discussion or feedback from the

20   remainder of the public body."  [Doc. 38 at Ex. 32 (Ariz. Att'y Gen. Agency Handbook)

21   § 7.7.8 at 7-15.]  Ms. Rooks's scripture readings during the period of the Board meeting

22   specifically tied to this narrow exception are entirely disconnected from "recent

23   occurrences."  A.R.S. § 38-431.02(K).[7]

24

25   _____

26   [6] Doc. 38, Ex. 12 at PUSD-Rooks_000205; Ex. 14 at PUSD-Rooks_000236; Ex. 16 at
     PUSD-Rooks_000272-3; Ex. 18 at PUSD-Rooks_000308; Ex. 20 at PUSD-
     Rooks_000353; Ex. 22 at PUSD-Rooks_000401.

27   [7] Ms. Rooks seems to abandon (at 27) her argument regarding the Board President's
     discussion of participating in a recent school spelling bee.  Instead, she focuses on the

28   TED Talk discussed by Board Member Underhill.  As the District established (Doc. 38 at

Requiring compliance with the OML does not "restrict or abridge protected speech." *Hays Cnty. Water Plan. P'ship v. Hays Cnty., Tex.*, 41 S.W.3d 174, 182 (Tex. App. 2001) (finding "no restriction of the right of free speech" by requiring a public official to comply with Texas's OML); *see also Sandoval v. Bd. of Regents of Univ.*, 67 P.3d 902, 907 (Nev. 2003) (complying with an OML "does not infringe" on a public official's First Amendment rights). Thus, the District's "limitation" on Board Comments in a public meeting, during the portion of the meeting specifically reserved for a summary of current events, does not violate any constitutional rights.

Ms. Rooks attempts (at 28) to dodge the OML by arguing without support that "a short scripture reading isn't a 'matter[ ]' required by the Open Meeting Law to be listed on any agenda." While the OML identifies two types of required agenda items, "matters to be discussed, considered or decided" and "a brief summary of current events," A.R.S. § 38-431.02(H), (K), her scripture readings fit neither category. Thus, they are not appropriate subjects for the public meeting, and, in any event, they are not appropriate under the narrow current-events exception.

Far from "requir[ing] that the entirety of every board meeting be scripted word for word in advance," (Doc. 41 at 28), the OML ensures the public's right to know what a public body will consider at public meetings, so the public can make informed decisions about whether to attend and listen. Ariz. Att'y Gen. Op. No. I99-006 at 3 (citing 1962 Ariz. Sess. Laws ch. 138, § 2). The OML bars Ms. Rooks's statements.

### III. Even considering the merits, Ms. Rooks fails to prove her claims.

If the Court considers the substance of Ms. Rooks's allegations, it should grant the District's motion because Ms. Rooks fails to show that she is entitled to relief.

### A. Ms. Rooks's scripture recitals do not comply with the Establishment Clause.

---

17), Ms. Underhill's comment was a summary of current events because the Board heard that TED Talk at a recent District Governing Board retreat.

Ms. Rooks compares (at 16-17) her Bible recitations to prayers conducted in the legislative and executive branches. But public-school settings are different. If there is an unbroken tradition, it is that courts have consistently prohibited religious practices in public-school settings because of their coercive effect on students whose attendance is not truly voluntary (Doc. 38 at 22-24). This is true in and out of the classroom, including at school board meetings. Both the facts and law show that Ms. Rooks's scripture recitals violate the Establishment Clause.

### 1.   There is not a historical practice of school board religious invocations.

In its motion (Doc. 38 at 21-22), the District established that there is no historical practice of school board invocations because public schools did not exist at the founding. Typically pointing to ceremonial legislative prayers, Ms. Rooks argues (at 21) that there is no Establishment Clause violation where "history shows that the specific practice is permitted." *Town of Greece, N.Y. v. Galloway*, 572 U.S. 565, 577 (2014). But as the District showed (Doc. 38 at 25-27), "[t]he setting of legislative prayers . . . only dimly resembles" the District's Governing Board meetings. *See Freedom From Religion Found., Inc. v. Chino Valley Unified Sch. Dist. Bd. of Ed.*, 896 F.3d 1132, 1145 (9th Cir. 2018).

Nonetheless, Ms. Rooks contends (Doc. 34 at 16; Doc. 41 at 21) that the annual reports of Horace Mann, Secretary of the Massachusetts Board of Education, show that there is a history of prayer during meetings of publicly funded school boards. But Secretary Mann's annual reports were not present-day school board meetings. There is no indication that students were present or participated. And nothing indicates that Mann wrote about taxpayer-funded schools. Moreover, Mann's reports are from the mid-1800s—not the founding.[8]

---

[8] Ms. Rooks ignores the District's citation (Doc. 38 at 21-22) to former Judge McConnell's research showing that public schools simply did not exist at the founding. Instead, schools were extensions of local churches, *i.e.*, private operations.

Ms. Rooks writes off (at 22) that the practice has to date back to the founding because the prayers at the town's board meetings in *Town of Greece* only dated back to the twentieth century. *See* 572 U.S. at 570. But the practice of legislative prayer dates to the founding, be it in town boards meetings, state legislatures, or Congress. *See id.* at 576-77; *Marsh v. Chambers*, 463 U.S. 783, 786-88 (1983). Ms. Rooks does not dispute that public schools did not exist at the founding. Religious invocations at public school board meetings therefore cannot "faithfully reflec[t] the understanding of the Founding Fathers." *See Kennedy v. Bremerton Sch. Dist.,* 597 U.S. 507, 535-36 (2022).

The District also showed (Doc. 38 at 22-24) that courts and legislatures routinely prohibit religious practices in public school settings because of the coercive effect on students. Ms. Rooks contends (Doc. 41 at 20) that her recitations "entirely avoid[] the main challenge in prayer cases—whether attendees were coerced to 'participate.'" Her argument (at 20) is premised on the notion that she has not expressly asked people to participate, and no one has *technically* participated in her recitations.

But Ms. Rooks's argument ignores that students *were c*ompelled to participate in her religious exercise simply by attending meetings. And the choice between compelled religious exercise or participation in school-sponsored activities is precisely what the Constitution forbids. *See Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 312 (2000) ("The Constitution . . . demands that the school many not force this difficult choice [between attending these games and avoiding personally offensive religious rituals] upon these students.").[9] "It is a tenet of the First Amendment that the State cannot require one of its citizens to forfeit his or her rights and benefits as the price of resisting conformance to state-sponsored religious practice." *Lee v. Weisman*, 505 U.S. 577, 596 (1992).

---

[9] Ms. Rooks contends (at 23 n.10) that cases involving prayer and Bible recitations in public school settings do not apply unless students' participation was compulsory. But *Santa Fe Independent School District* did not hinge on students' mandatory attendance. "Even if we regard every high school student's decision to attend a home football game as purely voluntary, we are nevertheless persuaded that the delivery of a pregame prayer has the improper effect of coercing those present to participate in an act of religious worship." 530 U.S. at 312.

1          Citing *Town of Greece*, Ms. Rooks contends (at 23) that her recitals are not

2    coercive because student attendance at meetings is not required and "constituents are free

3    to enter and leave with little comment."  572 U.S. at 590.  (citation and quotation marks

4    omitted).  But as the Court acknowledged in *Town of Greece*, the choice to exit or remain

5    during legislative prayers does not present an "unconstitutional imposition as to *mature*

6    *adults*, who 'presumably' are 'not readily susceptible to religious indoctrination or peer

7    pressure.'"  *Id.* (emphasis added) (quoting *Marsh*, 463 U.S. at 792).  Religious invocations

8    at school board meetings, however, are "not the sort of solemnizing and unifying prayer,

9    directed at lawmakers themselves and conducted before an audience of mature adults free

10   from coercive pressures to participate."  *Chino Valley*, 896 F.3d at 1142.  Ms. Rooks

11   ignores these distinctions.

12         The District examined *Chino Valley* in its motion (Doc. 38 at 23).  There, the Ninth

13   Circuit distinguished school board prayer from legislative prayer and found that there was

14   no historical practice of school board prayer.  *Chino Valley,* 896 F.3d. at 1146-48.

15   Ms. Rooks does not seriously engage with *Chino Valley*.  Instead, she wrongly suggests

16   (at 20) that the District's reliance on *Chino Valley* is misplaced because *Chino Valley* is

17   bad law after *Kennedy*.

18         In fact, Ms. Rooks contends (at 21) that any historical analysis by the Court in

19   *Chino Valley* is "useless" because it conducted the analysis under the legislative prayer

20   exception, not the rule requiring courts to examine historical practices and

21   understandings.  But these are two sides of the same coin.  Ms. Rooks does not explain

22   how the analysis differs under the historical practices test because it is the same analysis

23   with a different name.  Nor does Ms. Rooks argue that the outcome of *Chino Valley* would

24   have been different if *Lemon* had not been abrogated.  The Court was unambiguous:

25   "prayer at school-board meetings cannot be understood as part of the historical tradition

26   of legislative prayer," regardless of anything about compelled attendance, who made the

27   religious statements, etc.  *Chino Valley, 896 F.3d* at 1147.  The Ninth Circuit has not

28

13

1   revisited *Chino Valley*, and nothing in *Kennedy* contravenes *Chino Valley's* historical

2   practices analysis.  It remains controlling precedent in this Circuit.

3   **2.   Ms. Rooks's authorities do not support her claim.**

4   Whether a particular practice complies with the Establishment Clause is a fact-

5   intensive inquiry that examines "the setting in which the prayer arises and the audience

6   to whom it is directed."  *Town of Greece*, 572 U.S. at 587.  Ms. Rooks's authorities are

7   factually distinguishable.  These distinctions are fatal to her claim.

8   Ms. Rooks analogizes her recitations (at 24) to the coach's prayers in *Kennedy*,

9   asserting that her "personal religious practice that requests no one to join is no different

10  than Coach Kennedy's prayers."  But the coach in *Kennedy* prayed *silently* on the field

11  *after* his employment duties ended and *without students present*. 597 U.S. at 539.

12  Ms. Rooks broadcasted her prayers from the dais in the middle of school board meetings

13  where students were not only present but actively participating.   Unlike the coach's

14  "private religious exercise" in *Kennedy*, Ms. Rooks's recitals cross the line from

15  "protected private expression" to "impermissible government coercion."  *See id.* at 537.

16  Ms. Rooks ignores these distinctions that the District identified (Doc. 38 at 27-28).

17  Ms. Rooks also compares her recitals to the prayers at town board meetings in

18  *Town of Greece*.  She argues (at 19) that, if quoting scripture during town board meetings

19  does not violate the Establishment Clause, neither do her recitals during Board

20  Comments.  Ms. Rooks asserts (at 24) that the Supreme Court permitted the prayers in

21  *Town of Greece* despite the "occasional attendance of students" at town board meetings.

22  572 U.S. at 599 (Alito, J., concurring).

23  But *Town of Greece* did not involve a school board.  *See id.* at 570.  This distinction

24  matters because, unlike legislatures, school boards solely exist to set polices for students

25  and their education.  Here, students' connection to the Board is not attenuated and their

26  attendance at meetings is not occasional or incidental.  Rather, the record reflects (Doc.

27

28

1   38 at 26) that students participated in 80% of the meetings where Ms. Rooks recited the

2   Bible.[10]

3       Ms. Rooks also misrepresents the Court's holding in *Town of Greece*. She

4   contends (at 19) that the "Supreme Court has already held there's no Establishment

5   Clause violation when officials quote scripture at public meetings."  But the prayers in

6   *Town of Greece* were given by rotating *clergymen* during the ceremonial portions of

7   meetings.  572 U.S. at 570-71.  They were not by an elected official and not from the dais

8   during the middle of meetings.  This case is different.

9       Finally, Ms. Rooks improperly relies (at 19-20) on the only circuit court decision

10  finding there is a historical practice of school board prayer.  But she again ignores facts

11  distinguishing that case, as identified by the District (Doc. No. 38 at 24).  In *American

12  Humanist Association v. McCarty*, the school board selected *students* from a list of

13  volunteers to give a one-minute expression during the ceremonial portion of meetings.

14  851 F.3d 521, 524 (5th Cir. 2017).  Students often included religious invocations in their

15  expressions.  *Id.* Ms. Rooks is not a student, and her recitals are not during the ceremonial

16  portion of meetings.  Every other circuit to consider this issue has found that there is no

17  historical practice of school board prayer.  *See Chino Valley*, 896 F.3d at 1148; *Coles ex

18  rel. Coles v. Cleveland Bd. of Educ.*, 171 F.3d 369, 382 (6th Cir. 1999); *Doe v. Indian

19  River Sch. Dist.*, 653 F.3d 256, 280-81 (3d Cir. 2011).

20      In sum, Ms. Rooks identifies no cases with remotely similar facts supporting her

21  argument that a school board member reciting the Bible from the dais during the middle

22  of meetings comports with the Establishment Clause.  Instead, controlling law establishes

23  that there is not a historical practice of school board religious invocations.  The Court

24  should grant the District's motion.

25

26

27  _____

28  [10] Doc. 38, Ex. 6 at PUSD-Rooks_000057; Ex. 8 at PUSD-Rooks_000096; Ex. 10 at
    PUSD-Rooks_000171;  Ex. 12 at PUSD-Rooks_000207-08;  Ex. 14 at PUSD-
    Rooks_000238; Ex. 16 at PUSD-Rooks_000273-74; Ex. 18 at PUSD-Rooks_000309,
    312; Ex. 22 at PUSD-Rooks_000403.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.    Ms. Rooks fails to cite law and facts supporting her First Amendment free speech claim.**

Ms. Rooks ignored all but one of the District's cited First Amendment authorities. She does not dispute that, to succeed on her free speech claim, she must show: (1) she engaged in a protected activity, (2) she was subject to adverse action that would chill an ordinary person from engaging in the protected activity, and (3) a causal relationship between the two.  *Blair*, 608 F.3d at 543.  Here, Ms. Rooks did not engage in protected speech, and she suffered no adverse action.

**1.    Ms. Rooks did not engage in protected speech.**

Ms. Rooks contends that her recitals are protected speech because she said it as a Board member during meetings, citing (at 25-26) *Bond v. Floyd*, 385 U.S. 116 (1966). But the legislator's speech in *Bond* did not occur on the legislative floor.  There, the representative-elect made statements during an interview on his personal time, and the Georgia legislature prevented him from taking his seat.  *See id.* at 118-23.  Here, Ms. Rooks recited scripture from the dais during meetings.  As the District established (Doc. 38 at 28), the First Amendment does not guarantee that elected officials may use governmental mechanisms to convey personal messages.  *See Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 127 (2011).

Ms. Rooks attempts (at 26 n.11) to limit *Carrigan* to its facts: a state law that prohibited legislators from voting on matters in which they had personal conflicts.  *See* 564 U.S. at 119-20.  But the Ninth Circuit has extended *Carrigan*'s application outside of the individual voting power context to other powers held by legislative bodies (Doc. 38 at 28).  In *Linthicum v. Wagner*, 94 F.4th 887 (9th Cir. 2024), the Ninth Circuit held that depriving the legislature of a quorum is "'an exercise of the power of the legislator's office' and therefore is not activity protected under the First Amendment."  *Id.* at 892. The "ability to stymie legislation" belongs to the legislature, and the use of this power "implicates the 'governmental mechanics' of the legislative process, and *Carrigan* makes

16

1   clear that a legislator 'has no right' under the First Amendment to use that official power

2   'for expressive purposes.'" *Id.* at 893 (quoting *Carrigan*, 564 U.S. at 127)).

3          *Linthicum* applies here.  The right of individual Board members to speak during

4   the Board Comments portion of meetings is not personal.  Instead, it is a statutory power

5   bestowed only on the chief administrator and elected officials.  *See* A.R.S. 38-431.01(K).

6   Private citizens do not enjoy the right to provide a current events summary at Board

7   meetings.  Ms. Rooks's use of "governmental mechanics" to convey a personal message

8   therefore is not entitled to First Amendment protections.

9                    **2.      Ms. Rooks suffered no material adverse action.**

10         Ms. Rooks also contends (at 28) that she suffered material adverse action because

11  the District "disrupted, pressured, and silenced Rooks to stop her from quoting scripture."

12  The record disproves that argument.  Her claim (at 28) that the Board President "silenced"

13  her is false; the Board President's singular reminder did not prevent her from quoting

14  scripture.  [*See* § I.D.]  In any event, the Board President's reminder is not attributable to

15  the rest of the Board or to "District," *per se*.  The Board President only reiterated Board

16  counsel's advice: that counsel had twice advised the Board that personal and religious

17  speech during meetings violated the law after receiving complaints from outside entities.

18  [Doc. 1-3; Doc. 1-6.]  There was no threat of enforcement or harm from the District, only

19  a reminder of advice that was provided to all Board members.  (*See* § I.A.)

20         Moreover, Ms. Rooks decided to stop reciting scripture after she retained counsel

21  and assessed the risks, not because of the Board counsel's advice or Board President's

22  reminder.  [Doc. 38 at Ex. 24 at PUSD-Rooks_000413.]  She suffered no harm from any

23  Board action, and her citations (at 28) to *Muldrow* and *Arizona Right to Life* are

24  inapposite.  *See Muldrow v. City of St. Louis, Mo*, 144 S.Ct. 969, 972, 974 (2024) (change

25  in responsibilities, perks, and schedule because of transfer to another division was

26  "disadvantageous" in violation of Title VII); *Ariz. Right to Life Pol. Action Comm.*, 320

27  F.3d at 1006 (self-censorship constituted actual harm where statute threatened civil

28  penalties for violation).

### 3. The alleged "policy" is viewpoint and content neutral.

The District also showed (Doc. 38 at 30) that any alleged "policy" is viewpoint and content neutral because it applied to all speech that could violate the Establishment Clause and OML. Ms. Rooks's response cherry picks (at 26-27) decontextualized words from Board counsel's advice, the Board President's reminder, and the District's motion about scripture and Bible verses, and mischaracterizes these snippets in arguing that the District only prohibited Ms. Rooks's scripture recitals. But she ignores the remarks applying this to *all* speech by *all* Board members (Doc. 38 at 31). [Doc. 1-3; Doc. 1-6 at 3.] The District did not regulate speech based on specific "motivating ideology." *Contra Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 824-25 (1995) (withholding funds for religious views in publications but not political views).

The District also did not engage in "selective enforcement" of any alleged policy, as Ms. Rooks contends (at 27). The District demonstrated (Doc. 38 at 18, 30) that Ms. Underhill's comments about the TED Talk satisfied the OML. Ms. Rooks's recitations did not. Ms. Rooks points to no comparable secular speech that the District treated differently.[11] *Contra Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1163 (9th Cir. 2022) (prohibiting religious messages on graduation caps but permitting secular messages). This is fatal to her claim.

### C. Ms. Rooks shows no violation of Arizona's Free Speech Clause.

The District established (Doc. 38 at 31-32) that the alleged "policy" is narrowly tailored under the Free Speech Clauses of the First Amendment and Arizona Constitution because it was no broader than necessary to ensure compliance with the law. Ms. Rooks contends (at 29-30) that the District's "policy" is not narrowly tailored because there are less restrictive ways to limit speech to comply with the law.

---

[11] Ms. Rooks abandoned the spelling bee example from her Motion (Doc. 34 at 9). She tacitly conceded that those comments satisfied the OML, and this example does not support her argument that the District "selectively" enforces the alleged "policy" or law (Doc. 38 at 18, 30).

1    She suggests (at 29-30) that moving the Board Comments portion of meeting,

2    including disclaimers on the agenda, or eliminating Board Comments altogether are less

3    restrictive means.  But these are not required for the purported "policy" to be sufficiently

4    narrow.  As the District established (Doc. 38 at 31), the "policy" is sufficiently narrow

5    because Ms. Rooks can recite scripture before or after meetings or even quietly to herself

6    during meetings and still comply with the law.  The District did not in any way limit her

7    protected speech.  *Contra Mountain States Tel. & Tel. Co. v. Ariz. Corp. Comm'n*, 160

8    Ariz. 350, 358 (1989) (regulation limiting *all* access to the dial-a-message services

9    without subscription was not sufficiently narrow).  [*See* §§ II., III.B.1.]  Moreover, any

10   personal or religious speech would still violate the Establishment Clause and OML if the

11   District moved Board Comments or added a disclaimer.  Ms. Rooks fails to meet her

12   burden on this claim.

13        **D.    Ms. Rooks's free exercise claim lacks support.**

14        The District showed (Doc. 38 at 33-34) that the alleged "policy" is neutral,

15   generally applicable, and serves a compelling interest because it applies equally to all

16   Board members for all speech to comply with the law.  Ms. Rooks reiterates (at 30-31)

17   her free speech arguments that the District's purported "policy" is not neutral or generally

18   applicable because it treats religious acts differently than comparable secular conduct.

19   That argument fails here for the same reasons.  [*See* § III.B.3.]

20        Ms. Rooks argues (at 30-31) that the District does "little to dispute" that its actions

21   substantially burdened her free exercise under the First Amendment.[12]  But as the District

22   established (Doc. 38 at 33), a neutral general law of general applicability need not be

23   justified by a compelling governmental interest, even if it incidentally burdens free

24   exercise.  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531

25   (1993).  The substantial burden requirement does not apply here because the purported

26

27   _____

[12] The District's argument about "fortification" (Doc. 38 at 15) had nothing to do with the
substantial burden analysis, as Ms. Rooks contends (at 30).  Rather, the District pointed
out that the timing of her recitals distinguished this case from those involving ceremonial
prayers that did not violate the Establishment Clause.

28

"policy" is neutral and generally applicable. *See Kennedy*, 597 U.S. at 526; *Fulton v. City of Phila., Pa.*, 593 U.S. 522, 533 (2021).

Even if it somehow applies here, however, Ms. Rooks does not argue that the substantial burden analysis under the First Amendment's Free Exercise Clause differs from that under Arizona's Free Exercise of Religion Act ("FERA"). Ms. Rooks fails to show that a District "policy" substantially burdened her free exercise by imposing a penalty or denying a benefit for noncompliance. The cases Ms. Rooks cites in her motion (Doc. 34 at 22-23) do not support her argument. Those cases involved penalties by the government for religious exercise. *See Kennedy*, 597 U.S. at 525 (discharging coach for praying "briefly and by himself" after games); *McDaniel v. Paty*, 435 U.S. 618, 621 (1978) (disqualifying ministers from serving as legislators). Ms. Rooks faced no threats, no discipline, and no adverse action for her recitals. [*See* § I.A.]

**E.** **Ms. Rooks fails to prove her FERA claim.**

The District established (Doc. 38 at 35-36) that the alleged "policy" did not substantially burden Ms. Rooks's free exercise under FERA. Ms. Rooks analogizes (at 32) this case to *Brush & Nib Studio, LC v. City of Phoenix*, 247 Ariz. 269 (2019), arguing that the threat of civil sanctions or disciplinary action is a substantial burden.[13] But Ms. Rooks does not identify what civil sanctions she faced from the District because she did not face any. [*See* § I.B.] This case is not like *Brush & Nib Studio* where the plaintiffs faced "severe civil and criminal sanctions." 247 Ariz. at 299 ¶ 135. Ms. Rooks fails to meet her burden here.

**CONCLUSION**

For the reasons stated in its cross-motion and this reply, the District respectfully asks the Court to grant summary judgment in its favor.

---

[13]Ms. Rooks also cites (at 27) *Simonsen v. Arizona Department of Corrections*, 2009 WL 1600401 (Ariz. Ct. App. June 8, 2009) (mem.). This citation violates Arizona Supreme Court Rule 111(c)(1)(C), and the Court need not consider it.

1

DATED this 17th day of May, 2024.

2

OSBORN MALEDON, P.A.

3

4

By  s/ Alexandria N. Karpurk
    James D. Smith
    David D. Garner
    Sarah P. Lawson
    Alexandria N. Karpurk
    2929 North Central Avenue, Suite 2000
    Phoenix, Arizona 85012

5

6

7

Attorneys for Defendant

8

9

10

11

**CERTIFICATE OF SERVICE**

12

I hereby certify that on May 17, 2024, I electronically transmitted the attached

13

document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

14

Notice of Electronic Filing to all CM/ECF registrants.

15

I hereby certify that on May 17, 2024, I served the attached document by overnight

16

mail on the Honorable Michael T. Liburdi, United States District Court, Sandra Day

17

O'Connor U.S. Courthouse, Suite 524, 401 West Washington Street, SPC 57, Phoenix,

18

Arizona 85003-2156.

19

20

s/ Sylvia Aguayo

21

22

23

24

25

26

27

28

21