## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Heather Rooks, | No. CV-23-02028-PHX-MTL |
| Plaintiff, | **ORDER** |
| v. | |
| Peoria Unified School District, | |
| Defendant. | |

Before the Court is Plaintiff Heather Rooks's Motion for Summary Judgment (Doc. 34) and Defendant Peoria Unified School District's Cross-Motion for Summary Judgment (Doc. 38). The Motions are fully briefed (Docs. 34, 37, 38, 41, 45.) The Court held oral argument on January 10, 2025. For the reasons listed below, the Court will deny Heather Rooks's Motion for Summary Judgment and grant Peoria Unified School District's Cross-Motion for Summary Judgment.

## I.    BACKGROUND

Defendant Peoria Unified School District ("PUSD") is an Arizona public school district in the greater Phoenix-metro area. (Doc. 1 ¶ 12; Doc. 13 ¶ 12.) PUSD is governed by the Peoria Unified School District Governing Board (the "Board"), consisting of five members. (*See* Doc. 1 ¶ 12; Doc. 13 ¶ 12; Doc. 38 at 4.) Each member is elected to a four-year term, serves without compensation, and is "elected in conjunction with state and federal elections every two years." (Doc. 1 ¶ 12; Doc. 13 ¶ 12.)

The Board itself does not educate or teach any students, nor does it manage the day-to-day operations of any schools. (Doc. 1 ¶ 12; Doc. 13 ¶ 12.) Instead, the Board "is authorized under the laws of the state of Arizona to adopt all needed policies and regulations for the organization, evaluation, and governance [of PUSD]." (*See* Doc. 34 at 2; Doc. 38-8 at 7.)

The Board holds public meetings where it "vote[s] on various issues relating to school policy, evaluate[s] budgets, answer[s] questions, and listen[s] to concerns from the community." (Doc. 1 ¶¶ 15-16; Doc. 13 ¶¶ 15-16.) "All powers of the Board lie in its action as a public body." (Doc. 38-8 at 8.) So all board meetings, other than an executive session, are open to the public. (Doc. 1 ¶¶ 15-16; Doc. 13 ¶¶ 15-16.) Board meetings include a time for "board comments." (Doc. 1 ¶ 18; Doc. 13 ¶ 18.) During board comments, members of the Board "make remarks without listing the contents of their remarks on the official meeting agenda." (*See* Doc. 1 ¶ 18; Doc. 13 ¶ 18.)

Plaintiff Heather Rooks was elected to the Board in November 2022. (Doc. 1 ¶ 14, Doc. 13 ¶ 14.) She began her term in January 2023. (Doc. 1 ¶ 14, Doc. 13 ¶ 14.) At her first board meeting, Rooks ended her board comments by reciting Joshua 1:9, "Have I not commanded you? Be strong and courageous. Do not be afraid; do not be discouraged, for the Lord your God will be with you wherever you go." *Peoria Unified Governing Board Meeting (January 12, 2023)*, YouTube (Jan. 12, 2023), https://www.youtube.com/live/YLeUNYWgeWM?t=1597s (beginning at 27:35).[1] At her second meeting, Rooks opened her board comments by reciting Isaiah 41:10, "So do not fear, for I am with you; do not be dismayed, for I am your God, and I will strengthen and help you, and I will uphold you with my righteousness." *Peoria Unified Governing Board Meeting (February 9, 2023)*, YouTube (Feb. 9, 2023), https://www.youtube.com/live/S31wCFpPaH8?t=1982s (beginning at 33:02).

The scripture readings prompted a complaint from Secular Communities of Arizona, Inc. (Doc. 34 Ex. 2.) The complaint was addressed to the entire Board and claimed Rooks

---

[1] The Parties have stipulated to the authenticity of PUSD's Governing Board meeting videos on PUSD's YouTube channel. (Doc. 15 ¶ 4; Doc. 21 at 9-10.)

was violating the Establishment Clause of the First Amendment by reciting Bible verses at board meetings. (*See id.* at 47, 50.) It requested the Board immediately refrain from reading scripture during meetings and for "[b]oard members [to] cease using their public position to preach their private religious beliefs." (*See id.* at 50.)

After receiving the complaint, a board member consulted with the Board's attorney "on the legalities of reading [s]cripture at board meetings." (*See* Doc. 34 Ex. 5.) That consultation resulted in an email from the Board's executive assistant, which provided "a summary of the attorney's guidance" to all board members. (*See id.* at 61.) The attorney advised "a board member acting in their role as such, should not read Scripture during a board meeting, as it violates the Establishment Clause," and "the First Amendment is not applicable in this situation, as [a board member] is speaking as a member of the public governing body, not [as] an individual." (*Id.*) Legal counsel further advised board comments are meant "for a brief summary of current events as it relates to service as a board member." (*Id.*) Anything beyond this "could be a violation of the Open Meeting Law." (*Id.*)

A day after the email, Rooks recited Proverbs 22:6 during her board comments. *Peoria Unified Governing Board Meeting (February 23, 2023)*, YouTube (Feb. 23, 2023), https://www.youtube.com/live/QuOgJGSNK8c?t=6844s (beginning at 1:54:04). Two weeks later, she recited 1 Corinthians 16:13. *Peoria Unified Governing Board Meeting (March 9, 2023)*, YouTube (Mar. 13, 2023), https://www.youtube.com/watch?v=cWZa8l153M8&t=5185s (beginning at 1:26:25).

Rooks was not interrupted while reading 1 Corinthians 16:13. After reading the verse, Rooks thanked students and staff from a recent school visits, *id.* (beginning at 1:26:34), and she congratulated a high school basketball team for winning the state championship, *id.* (beginning at 1:27:18). Rooks then acknowledged a student who reported a teacher for wrongdoing, *id.* (beginning at 1:27:36), and began discussing her research on a 2019 initiative to bring social workers into PUSD schools, *id.* (beginning at 1:27:52).

Rooks explained her research centered around a mental health grant PUSD was awarded in 2019—three years before the current board meeting. *See id.* The grant was supposed to pay for social workers to come into PUSD schools. *See id.* But Rooks explained her research revealed students were surveyed on their social and emotional learning needs in connection with the grant. *See id.* As a mother whose children were enrolled with PUSD in 2019, Rooks drew issue with the survey because students participated in it without parent approval. *See id.*

Following this statement, Rooks was interrupted by the Board's president (the "Board President"). *Id.* (beginning at 1:28:44). The Board President apologized for the interruption but made a point of order concerning Rooks's statements on the mental health grant. *See id.* The Board President said, "each one of us has received an email from legal around discussing items that aren't on the agenda during board comments and how doing so goes against open meeting laws." *Id.* The Board President then continued, "[w]e were also told that reciting scripture at a board meeting on this side of the dais goes against the Establishment Clause . . . . We were directed by legal on this, so it is important that I bring it up, so I just needed to make that comment." *Id.* Several members of the audience began to express their disapproval over the interruption. *Id.* (beginning at 1:29:57). The Board President then ceded the floor back to Rooks, and she continued with her board comments. *See id.*

Rooks responded to the interruption by saying board comments can relate to the "service" of a board member, implying she thought the topic was appropriate. *Id.* (beginning at 1:30:47). Yet she ended her comments without further discussion. *Id.*

Rooks read scripture at the next four board meetings, taking place on April 13, April 27, May 11, and May 22. Her readings were not interrupted. In fact, another board member also recited scripture at the May 11, 2023, meeting. *Peoria Unified Governing Board Meeting (May 22, 2023)*, YouTube (May 22, 2023), https://www.youtube.com/live/IV-cJi-1270?t=1364s (beginning at 22:44). Rooks, however, was interrupted by the Board President while discussing a school safety grant during her board comments at the April

13, 2023, meeting. *Peoria Unified Governing Board Meeting (April 13, 2023)*, YouTube (Apr. 13, 2023), https://www.youtube.com/live/aObq4-dlyZI?t=2610s (beginning at 45:55). The Board President reminded Rooks of "the importance of staying within our open meeting law governance." *Id.*

After the May 22 meeting, the Board received another complaint—this time from the Freedom from Religion Foundation. (Doc. 34 Ex. 3.) The complaint requested PUSD "take appropriate action to stop board members from using their government positions to promote their personal religious beliefs." (*Id.* at 53.) And for the Board to "take whatever action necessary to ensure that [Rooks] and all other members of the Board respect the constitutional rights of the [PUSD] community" by refraining from reciting Bible verses at meetings. (*Id.* at 54.) The complaint warned reciting scripture was unconstitutional under the Establishment Clause, and failure to stop Rooks and the other board member would subject PUSD "to unnecessary liability and potential financial strain" because "statements of school board members are attributable to the district." (*See id.* at 54-55.) By way of example, the complaint stated the Freedom from Religion Foundation had previously "secured a court order against a California school district regarding its school board prayers," resulting in the school district needing to pay more than $275,000 in attorneys' fees and costs. (*See id.* at 54.)

Rooks recited scripture two more times at the June 8 and June 22 board meetings. She was not interrupted during either recital. But the Freedom from Religion Foundation did send another complaint after the June 22 meeting. (Doc. 34 Ex. 4.) The complaint again warned Rooks's conduct was unconstitutional. (*See id.* at 58.) It asked the Board "to censure any school board members who abuse their position by pushing their personal religious beliefs during board meetings." (*Id.*)

About two weeks after the Freedom from Religion Foundation sent its second complaint, the Board received an email from its attorney titled "ATTORNEY CLIENT PRIVILEGED COMMUNICATION: Freedom from Religion Foundation Letter." (*See* Doc. 34 at 10-11, Ex. 6.) Counsel reiterated PUSD has now received several

communications from entities threatening further legal action "if board members do not stop offering bible verses." (*Id.* at 64.) The threatened action was described as entities "filing a lawsuit against [PUSD] for violating the First Amendment or filing an open meeting law complaint against any board member who recites [B]ible verses." (*Id.*)

The Board's attorney next provided an interpretation of the law. The attorney said "[t]he law is clear that [b]oard members, acting in their official capacities at [b]oard meetings, may not pray or offer [B]ible verses at [b]oard meetings because it is a violation" of Arizona law and the Establishment Clause. (*See id.* at 64-65.) Counsel warned "[t]he risk to [PUSD] and to individual board members if board members continue to recite [B]ible verses is twofold." (*Id.* at 65.) First, the Freedom from Religion Foundation, Secular Communities of Arizona, Inc., "or individual community members could sue [PUSD] for violating the First Amendment." (*Id.*) If a lawsuit occurred, counsel predicted PUSD would likely "incur significant legal expenses in defending itself," as well as over $100,000 in attorney's fees for the plaintiff if PUSD lost, which counsel predicted was likely. (*Id.*)

Next, the Board's attorney warned continuing to recite Bible verses could result in the Arizona Attorney General pursuing "an open meeting law complaint . . . against both [PUSD] as a whole and any individual board member who violated the open meeting law." (*Id.*) Counsel explained a successful complaint against a board member could "result in fines . . . and, in some cases, a lawsuit to remove a board member from office." (*Id.*) The email concluded with counsel advising "it would be in the best interest of [PUSD] to cease offering [B]ible verses at [b]oard meetings." (*Id.*)

A day after the email, at the July 13, 2023, meeting, Rooks began her board comments by stating: "I received a letter from [PUSD] directing me to stop reciting Bible verses during school board meetings" because PUSD "asserts that doing so violates the Establishment Clause of the First Amendment."[2] *See Peoria Unified Governing Board Meeting (July 13, 2023)*, YouTube (July 13, 2023),

---

[2] Rooks's mention of "a letter" at her July 13, 2023, board comments refers to the email sent by the Board's attorney. (*See* Doc. 41 at 9-12.)

https://www.youtube.com/live/VxZ0MGCPcSc?t=2986s (beginning at 49:46). Rooks continued "based upon [PUSD's direction], I will refrain from reciting Bible verses at this time." *See id.*

Rooks brought this lawsuit after the July 13, 2023, meeting. It alleges two claims under the Declaratory Judgment Act and four claims under the federal Constitution, Arizona Constitution, and Arizona's Free Exercise of Religion Act. (*See generally* Doc. 1.) Rooks and PUSD agreed to fast-track the pleading stages and discovery. (*See* Doc. 15 at 2-3; Doc. 21 ¶¶ 14-15.) Their agreement limited the scope of discovery to board meeting videos posted on PUSD's YouTube channel, board meeting agendas and minutes posted on PUSD's website, five interrogatories, and ten requests for admission. (*See* Doc. 15 ¶¶ 4-5, ¶¶ 7-8; Doc. 21 ¶ 14.) The Parties also agreed not to take any depositions. (*See* Doc. 15 ¶ 9; Doc. 21 ¶ 14(c).) Now, they each have motions for summary judgment pending before the Court. (Docs. 34, 38.)

## II.    LEGAL STANDARD

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At the summary judgment stage, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citations omitted); *see also Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1131 (9th Cir. 1994) (holding that the court determines whether there is a genuine issue for trial but does not weigh the evidence or determine the truth of matters asserted).

Where, as here, the "parties submit cross-motions for summary judgment, each motion must be considered on its own merits." *Fair Hous. Council of Riverside Cnty. Inc.*

*v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (citations and internal quotations omitted). The summary judgment standard operates differently depending on whether the moving or non-moving party has the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). When the movant bears the burden of proof on a claim at trial, the movant "must establish beyond controversy every essential element" of the claim based on the undisputed material facts to be entitled to summary judgment. *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (citation omitted). If, however, the movant fails to make this showing, summary judgment is inappropriate, even if the non-moving party has not introduced contradictory evidence in response. When, on the other hand, the non-movant bears the burden of proof on a claim at trial, the movant may prevail either by citing evidence negating an essential element of the non-movant's claim or by showing that the non-movant's proffered evidence is insufficient to establish an essential element of the non-movant's claim. *See Celotex*, 477 U.S. at 322-23; *Nissan Fire & Marine Ins. v. Fritz Cos*, 210 F.3d 1099, 1103 (9th Cir. 2000).

## III.    DISCUSSION

PUSD moves for summary judgment on three grounds. First, Rooks lacks standing to bring suit. (Doc. 38 at 9.) Second, proper application of Arizona's Open Meeting Law does not violate Rooks's rights. (*Id.* at 15.) And third, Rooks has not proven a cognizable claim. (*Id.* at 20.)

Rooks argues she is entitled to summary judgment because reading scripture during board comments does not offend the Establishment Clause. (Doc. 34 at 11.) Alternatively, Rooks argues legislative immunity protects her "from adverse action based on the content of her comments during [b]oard [m]eetings," or PUSD's actions violate her First Amendment rights under the federal Constitution, Arizona Constitution, and Arizona's Free Exercise of Religion Act. (*See* Doc. 34 at 11, 20, 21, 24-29.) Rooks further maintains she has standing to pursue her claims. (*See generally* Doc. 41 at 8.)

### A.    Article III Standing

"Article III of the United States Constitution limits federal court jurisdiction to 'actual, ongoing, cases or controversies.'" *Wolfson v. Brammer*, 616 F.3d 1045, 1053 (9th Cir. 2010) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)). Federal courts determine when an ongoing case or controversy exists through the doctrine of standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing, a party invoking federal jurisdiction must demonstrate they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the [opposing party], and (3) that is likely to be redressed by a favorable judicial decision." *See Lake v. Fontes*, 83 F.4th 1199, 1202-03 (9th Cir. 2023) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).

As the elements suggest, "[t]he party invoking federal jurisdiction bears the burden of establishing" each element of standing to the same degree it proves "any other matter on which [it] bears the burden of proof." *See Lujan*, 504 U.S. at 561. The manner and degree of evidence needed to establish standing changes with each stage of the litigation. *See id.* At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice." *Id.* Once, however, the pleading stage has ended, and litigation has moved into discovery or beyond, the burden on the invoking party increases. *See id.* This increased burden means when standing is challenged during summary judgment, via a motion from a defendant, the invoking party must respond by "'set[ting] forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken to be true." *See id.* (quoting Fed. R. Civ. P. 56(e)); *see also Nissan Fire & Marine Ins.*, 210 F.3d at 1103.

### 1.    Injury in Fact

The first requirement for Article III standing is the invoking party must suffer "an invasion of a legally protected interest"—or an injury in fact. *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (quoting *Lujan*, 504 U.S. at 560). A cognizable injury normally must be "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical" to satisfy the first requirement. *See id.* (quoting *Lujan*, 504 U.S. at 560).

1

### i.    Analytical Framework

2    PUSD argues the Court should divide its injury-in-fact analysis into two categories

3 based on the claims alleged in the Complaint. (*See* Doc. 38 at 11-15.) The first concerns

4 claims three through six, which allege PUSD violated Rooks's right to free speech and free

5 expression under the federal Constitution, Arizona Constitution, and Arizona's Free

6 Exercise of Religion Act. (*See id.* at 11-14; Doc. 1 at 22-26.) PUSD contends these claims

7 are pre-enforcement challenges because Rooks "does not allege that she experienced any

8 retaliation from [PUSD]," and "[s]he also denies that she is currently reading Bible verses

9 at [b]oard meetings." (Doc. 38 at 11.) It asks the Court to find Rooks lacks standing to

10 bring these claims because it "has not enacted any rule, regulation, or policy that could

11 violate [Rooks's] First Amendment rights." (*See* Doc. 45 at 3.)

12    Next, PUSD asks the Court to separately consider Rooks's claims for declaratory

13 relief—claims one and two. (*See* Doc. 38 at 14.) Rooks's first claim seeks a judicial

14 declaration that she is entitled to absolute legislative immunity for "federal and state-law

15 claims arising from her statements as a [b]oard member during the official proceedings of

16 a formal [b]oard meeting." (Doc. 1 ¶ 47.) Her second claim asks the Court to "declare that

17 Rooks'[s] brief quotations of scripture during her [b]oard comments time at public school

18 board meetings do not violate the Establishment Clause." (*Id.* ¶ 54.) PUSD argues these

19 claims lack standing because it "has not brought a claim, sought relief, or threatened

20 adverse action for [Rooks's] potential violation of the Establishment Clause." (Doc. 38 at

21 14.) PUSD asks the Court to find both claims are advisory opinions because they seek relief

22 "from liability in *future* suits by *other* parties." (*See id.*)

23    Rooks disagrees with PUSD's suggestion and argues the Court should divide its

24 injury-in-fact analysis based on her requests for retrospective and prospective relief.  (*See*

25 Doc. 41 at 8-19.) Rooks argues PUSD's advisory opinion argument "is just window

26 dressing for [its] standing argument, which is wrong as a matter of both undisputed record

27 evidence and controlling judicial precedent." (*See id.* at 8) She continues by explaining her

28 claims seek "prospective relief for the ongoing effect of [PUSD]'s threats that are chilling

1    her speech" and "retrospective relief for [PUSD]'s past disruptions and threats." (*Id.*)

2    Rooks believes dividing the Court's injury-in-fact analysis based on these two theories is

3    the appropriate approach. (*See id.* at 8-19.)

4        The Declaratory Judgment Act authorizes "any court of the United States" to

5    "declare the rights and other legal relations of any interested party seeking such declaration,

6    whether or not further relief is or could be sought," presuming it is "a case of actual

7    controversy within [the court's] jurisdiction." 28 U.S.C. § 2201(a). The United States

8    Supreme Court has interpreted "case of actual controversy" as referring "to the type of

9    'Cases' and 'Controversies' that are justiciable under Article III." *MedImmune, Inc. v.*

10   *Genetech, Inc.*, 549 U.S. 118, 127 (2007). As such, "[t]he limitations that Article III

11   imposes upon [a] federal court[s'] jurisdiction [is] not relaxed in the declaratory judgment

12   context," and there is no need to separately analyze Rooks's first and second claims simply

13   because they seek a declaratory relief. *See Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d

14   1125, 1129 (9th Cir. 2005).

15       There is, however, reason to divide Rooks's claims based on her requests for

16   prospective and retrospective relief. The injury-in-fact prong carries different requirements

17   for pre-enforcement and post-enforcement challenges under the First Amendment. *See*

18   *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1174 (9th Cir. 2022); *see also Peace Ranch, LLC v.*

19   *Bonta*, 93 F.4th 482, 487 (9th Cir. 2024) ("Pre-enforcement injury is a special subset of

20   injury-in-fact."). In instances where enforcement has already occurred, the inquiry "focuses

21   directly on the three elements that form the 'irreducible constitutional minimum' of Article

22   III standing"—*i.e.* the injury is "(a) concrete and particularized, and (b) actual or

23   imminent." *Twitter, Inc.*, 56 F.4th at 1173; *Lopez*, 630 F.3d at 785 (quoting *Lujan*, 504 U.S.

24   at 560). But when enforcement has not yet occurred, and the First Amendment claim

25   concerns threatened government action against protected speech, the injury-in-fact

26   requirement of standing diminishes, creating an Article III injury whenever there is

27   threatened enforcement against constitutionally protected speech that is "sufficiently

28   imminent." *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-59 (2014); *see also*

*Twitter, Inc.*, 56 F.4th at 1174 ("Given that pre-enforcement claims necessarily occur before enforcement actions have begun, the standing factors for pre-enforcement claims are substantively similar to the ripeness factors and identical concerns motivate both analyses.").

Rooks seeks prospective relief for all her claims and retrospective relief for claims three through six. (*See* Doc. 41 at 8.) Looking at the Complaint, Rooks's first two claims for prospective relief were brought under the Declaratory Judgment Act. (Doc. 1 ¶ 8, ¶¶ 42-54.) Her third claim then alleged "[t]he threat of looming legal liability . . . chill[ed] her] protected right to free speech"; a factual allegation Rooks incorporated by reference into her remaining claims. (*See id.* ¶ 59, ¶ 60, ¶ 66, ¶ 72.) Claims three through six also repeatedly allege PUSD's "policy" and "actions" prevented Rooks from reciting Bible verses at board meetings. (*Id.* ¶ 58, ¶ 63, ¶¶ 69-70, ¶ 75.) Taken together, the Complaint indicates Rooks has sought prospective and retrospective relief since the beginning of this litigation.

The Court concludes adopting Rooks's requested framework best encapsulates the different requirements for pre-enforcement and post-enforcement injury in fact. *See Twitter, Inc.*, 56 F.4th at 1174. The Court will begin by examining whether Rooks's claims meet the requirements for pre-enforcement injury. It will then examine whether claims three through six meet the standard for post-enforcement injury.

### ii.     Pre-Enforcement Injury in Fact

The injury-in-fact requirement of standing normally demands "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citations omitted). Recognizing, however, pre-enforcement "challenges based on the First Amendment present unique standing considerations," the United States Supreme Court "has endorsed what might be called a 'hold your tongue and challenge now' approach" to standing, as opposed to "requiring litigants to speak first and take their chances with the consequences." *Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003). This

1    lessened standard diminishes the injury-in-fact requirement of standing by creating an
2    Article III injury whenever there is threatened enforcement against constitutionally
3    protected speech, so long as the enforcement is "sufficiently imminent." *See Driehaus*, 573
4    U.S. at 158-59; *see also Twitter, Inc.*, 56 F.4th at 1174.

5                          **a.    Legal Framework**

6           PUSD argues *Alaskan Right to Life Political Action Committee v. Feldman*, 504
7    F.3d 840 (9th Cir. 2007), provides the appropriate framework for evaluating when a threat
8    of enforcement is "sufficiently imminent" to create a pre-enforcement injury. *Drehaus*, 573
9    U.S. at 158-59; (Doc. 38 at 11.) Rooks contends a sufficient pre-enforcement injury only
10   requires "self-censorship in response to a credible threat." (*See* Doc. 41 at 9.)

11          The Ninth Circuit Court of Appeals first conceived its three-part test for analyzing
12   a possible pre-enforcement injury in *Thomas v. Anchorage Equal Rights Commission*, 220
13   F.3d 1134 (9th Cir. 2000). In *Thomas*, the court stated an injury depends on "whether the
14   plaintiffs have articulated a 'concrete plan' to violate the law in question, whether the
15   prosecuting authorities have communicated a specific warning or threat to initiate
16   proceedings, and the history of past prosecution or enforcement under the challenged
17   statute." *Id.* at 1139. Subsequent decisions reformulated the *Thomas* test into specific,
18   numbered factors. *See, e.g. Feldman*, 504 F.3d at 849. Relevant here, the Ninth Circuit in
19   *Feldman* used the *Thomas* test to find plaintiffs lacked standing to bring a pre-enforcement
20   challenge against certain portions of Alaska's Code of Judicial Conduct. *Id.* at 852-53.

21          But nearly fifteen years after *Thomas*, and about seven years after *Feldman*, the
22   United States Supreme Court articulated a different standard for evaluating
23   pre-enforcement injury. In *Driehaus*, the Court explained "a plaintiff satisfies the
24   injury-in-fact requirement" of pre-enforcement standing when they show "an intention to
25   engage in a course of conduct arguably affected with a constitutional interest, but
26   proscribed by a statute, and there exists a credible threat of prosecution thereunder." 573
27   U.S. at 159-60 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

28

1    The effect *Driehaus* had on the *Thomas* test remained unclear for many years.

2    Although the *Driehaus* test undoubtedly "incorporat[es] part of the essence of the [*Thomas*]

3    test," it also materially differs in several aspects. *Peace Ranch, LLC*, 93 F.4th at 487. As

4    an example, the *Driehaus* test only requires the intended conduct "arguably affect[] . . . a

5    constitutional interest," while the *Thomas* test requires the intended conduct be specifically

6    tied to the challenged provision. *Compare Driehaus*, 573 U.S. at 160, *with Thomas*, 220

7    F.3d at 1139. Those competing interests caused the Ninth Circuit to toggle between both

8    tests in the years after *Driehaus*. *See, e.g.*, *Unified Data Servs., LLC v. FTC*, 39 F.4th 1200,

9    1210 n.9 (9th Cir. 2022). But then, in 2024, the court acknowledged its inconsistency and

10   "adopt[ed] the Supreme Court's framework" in *Driehaus* as the appropriate test for

11   deciding pre-enforcement injury. *See Peace Ranch, LLC*, 93 F.4th at 487. The Ninth Circuit

12   has consistently used *Driehaus* since its 2024 proclamation. *See, e.g.*, *Seattle Pac. Univ. v.*

13   *Ferguson*, 104 F.4th 50, 59-61 (9th Cir. 2024); *Matsumoto v. Labrador*, 122 F. 4th 787,

14   797-99 (9th Cir. 2024). The Court, therefore, concludes PUSD incorrectly suggests

15   *Feldman* is the appropriate framework. (Doc. 38 at 11.) It will use the test outlined in

16   *Driehaus* to analyze whether Rooks has a constitutionally sufficient pre-enforcement

17   injury. *Peace Ranch, LLC*, 93 F.4th at 487.

18        Rooks argues a pre-enforcement injury only requires "self-censorship in response

19   to a credible threat." (*See* Doc. 41 at 9.) This argument relies on *Tingley v. Ferguson*, where

20   the Ninth Circuit said: "in the context of pre-enforcement challenges to laws on First

21   Amendment grounds, a plaintiff 'need only demonstrate that a threat of potential

22   enforcement will cause him to self-censor.'" 47 F.4th 1055, 1068 (9th Cir. 2022) (quoting

23   *Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 839 (9th Cir. 2014)).

24        The statement in *Tingley* stems from *Wolfson v. Brammer*, 616 F.3d 1045 (2010).

25   In *Wolfson*, the Ninth Circuit Court of Appeals recognized "[s]elf-censorship is a

26   constitutionally recognized injury." *See id.* at 1059. But it did so within the confines of the

27   Ninth Circuit's *Thomas* test. *See id.* at 1058-59. And importantly, the court only found a

28   cognizable injury after weighing the three *Thomas* factors. *See id.* Later cases from the

Ninth Circuit explain "self-censorship alone is insufficient to show [an Article III] injury." *Lopez*, 630 F.3d at 792; *see also Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003) ("We do not mean to suggest that any plaintiff may challenge the constitutionality of a statute on First Amendment grounds by nakedly asserting that his or her speech was chilled by the statute."). Thus, *Tingley* does not present a stand-alone framework for pre-enforcement injury. *Driehaus* remains the appropriate test.

Accordingly, to establish the existence of a pre-enforcement injury, Rooks must show "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Driehaus*, 573 U.S. at 160 (quoting *Babbitt*, 442 U.S. at 298); *Lujan*, 504 U.S. at 561 (stating the burden is on the party invoking federal jurisdiction).

### b.    First *Driehaus* Requirement

The first *Driehaus* requirement is the invoking party must demonstrate "an intention to engage in a course of conduct arguably affected with a constitutional interest." *See* 573 U.S. at 160 (quoting *Babbitt*, 442 U.S. at 298). Keeping with the "unique standing considerations" that arise within the context of pre-enforcement challenges based on the First Amendment, "a plaintiff need not plan to break the law" in order to satisfy the first requirement. *See Bayless*, 320 F.3d at 1006; *Peace Ranch, LLC*, 93 F.4th at 488. Instead, the inquiry "is more counterfactual than practical," requiring a plaintiff first prove they "would have the intention to engage in the proscribed conduct, were it not proscribed," and then prove the intended conduct was "arguably affected with a constitutional interest." *See Peace Ranch, LLC*, 93 F.4th at 488.

Rooks argues her intention to recite Bible verses is demonstrated through "recit[ing] scripture ten times at [school board] meetings before [PUSD's] threats caused her to self-censor," as well as her comments at the July 13, 2023, board meeting. (*See* Doc. 41 at 9.) At the July 13 meeting, Rooks said PUSD directed her "to stop reciting Bible verses during school board meetings" because PUSD "asserts that doing so violates the Establishment Clause of the First Amendment. *See Peoria Unified Governing Board*

*Meeting, supra* (beginning at 49:46). Rooks continued "[b]ased upon [PUSD's direction], I will refrain from reciting Bible verses at this time." *See id.*

PUSD does not dispute Rooks made those statements, nor does it provide any argument directly challenging the first *Driehaus* requirement. Nonetheless, the Court will analyze whether the evidence offered by Rooks satisfies her burden as the party invoking federal jurisdiction. *Lujan*, 504 U.S. at 561.

The evidence of Rooks "recit[ing] scripture ten times at [school board] meetings" demonstrates a past practice of speech. *See Peace Ranch, LLC*, 93 F.4th at 488 (stating a past practice can establish intent). And her statement at the July 13, 2023, board meeting demonstrates her intention to continue with that practice, if not for her concerns that eventually led to this lawsuit. When combined, this evidence sets forth adequate details about Rooks's intended speech. *See Lopez*, 630 F.3d at 787 (stating a plaintiff's allegations must be specific enough to avoid speculation as to the contents of their intended statements). Therefore, Rooks has shown her "intention to engage in a course of conduct." *See Driehaus*, 573 U.S. at 160.

Next, Rooks's conduct must be "arguably affected with a constitutional interest." *Id.* Considering "the Supreme Court has cautioned that standing 'in no way depend[s] on the merits,'" this inquiry does not require a mini litigation of Rooks's claims. *See Peace Ranch, LLC*, 93 F.4th at 488 (quoting *Arizona v. Yellen*, 34 F.4th 841, 849 (9th Cir. 2022)). Instead, the evidence only needs to demonstrate the intended conduct is *arguably* affected by a constitutional interest. *See id.* The evidence here demonstrates Rooks sought to recite Bible verses—conduct touching on constitutional interests in freedom of speech and freedom of religion. As such, Rooks has satisfied her burden of showing an arguably affected constitutional interest. *Driehaus*, 573 U.S. at 160. The Court concludes that the first *Driehaus* requirement has been met.

### c.    Second *Driehaus* Requirement

The second *Driehaus* requirement is the intended conduct must be "arguably . . . proscribed by a statute." *See* 573 U.S. at 160 (quoting *Babbitt*, 442 U.S. at

298). Here, the Court must first examine what conduct is proscribed by the challenged law. *See Yellen*, 34 F.4th at 849. Then, it must take the intended conduct established under the first *Driehaus* requirement and evaluate whether that conduct falls within the challenged law's sweep. *See id.* The Ninth Circuit has historically found conduct is not proscribed when a challenged law "by its terms is not applicable to the plaintiff[s], or the enforcing authority has disavowed the applicability of the challenged law," of course presuming "the government's disavowal . . . [is] more than a mere litigation position." *See Lopez*, 630 F.3d at 788.

This is where the unique factual circumstances of this case come into play. Rooks argues the "explicit warnings" contained in the two emails board members received from their executive assistant (Doc. 34 Ex. 5) and attorney (Doc. 34 Ex. 6) chilled her speech. (*See* Doc. 41 at 10-11.) But as the second *Driehaus* factor suggests, pre-enforcement standing normally applies to challenges targeted at a specific policy or statute. *See* 573 U.S. at 160. And while Rooks provides the Court with cases where pre-enforcement standing was found based on actions between private parties, (*see, e.g.*, Doc. 41 at 10-11 (citing *Societe de Conditionnement en Aluminium v. Hunter Eng'g Co.*, 655 F.2d 938, 944-45 (9th Cir. 1981)), she does little to demonstrate that government actions follow a similar standard.

What's more, the decision by Rooks and PUSD to fast-track the pleading stages and discovery has limited the evidence available to the Court. (*See* Doc. 15 at 2-3; Doc. 21 ¶¶ 14-15.) Neither party took any depositions or collected any additional discovery beyond the five interrogatories and ten requests for admission agreed to in the Stipulated Motion for Deadlines and Discovery (*See* Doc. 15 ¶ 7.) As a result, Rooks asks the Court to find pre-enforcement standing largely based on two emails sent to board members, as well as PUSD's response to one of Rooks's interrogatory questions (*See* Doc. 41 at 14.) In the Court's view, the decision to limit discovery puts Rooks on shaky footing, especially when that decision is combined with the theory of pre-enforcement standing being advanced in this case.

- 17 -

Despite these concerns, the Court notes "when the threatened enforcement effort implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing." *Bayless*, 320 F.3d at 1006 (quoting *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000)). Rooks will have all the benefits she is entitled to under this relaxed standard.

Rooks primarily cites two emails to support her argument PUSD prevented her from reciting Bible verses. (*See* Doc. 41 at 10-11.) The first email came from the Board's executive assistant, and it arose after a board member spoke with legal counsel following the first complaint from Secular Communities of Arizona, Inc. (Doc. 34 at 61.) The email summarized counsel's advice as "a board member acting in their role as such, should not read Scripture during a board meeting, as it violates the Establishment Clause." (*Id.*) The next email came directly from the Board's attorney after the Freedom from Religion Foundation sent its second complaint—about five months after the email from the Board's executive assistant. (*Id.* at 64-65.) It warned "[b]oard members, acting in their official capacities at [b]oard meetings, may not pray or offer [B]ible verses at [b]oard meetings because it is a violation" of Arizona law and the Establishment Clause." (*See id.*) It also warned continuing to recite scripture could lead to significant legal expenses for PUSD and a possible open meeting investigation against individual board members by the Arizona Attorney General. (*See id.*)

PUSD argues this evidence does not meet the second *Driehaus* requirement because Rooks does not identify a rule, regulation, or policy preventing her from reciting Bible verses at school board meetings. (*See* Doc. 38 at 11.) PUSD explains "[o]nly the *entire* board can adopt policies"—a two-step process that entails first presenting a proposal for review and then adopting the proposal at a separate meeting. (*See id.* at 11; Doc. 38-8 at 9.) Because no such process was ever initiated by the Board, and because no currently enacted policy prevents Rooks from reciting Bible verses, PUSD believes Rooks cannot establish her conduct was "proscribed by a statute" as a matter of law. (*See* Doc. 38 at 11-12.)

Next, PUSD classifies the emails sent to board members as "non-binding guidance . . . on how to avoid possible future legal liability." (Doc. 45 at 3.) PUSD thus agrees with Rooks the emails were "explicit warnings." (*Compare id.*, *with* Doc. 41 at 10-11.) But it argues the emails do not open the door to pre-enforcement standing because they only warned other entities could sue Rooks if she continued to recite Bible verses—as opposed to PUSD itself taking any action. (*See* Doc. 45 at 3.) PUSD, therefore, believes the emails could not have chilled Rooks's speech. (*See id.*) In addition, it notes board members were well aware they could ignore the legal advice provided in the emails, as demonstrated by Rooks continuing to recite Bible verses after the first email from the Board's executive assistant. (*See id.*)

### 1) Standard for Second *Driehaus* Requirement

PUSD argues Rooks can only satisfy the second *Driehaus* requirement by challenging a specific rule, regulation, or policy that prevents her from reading Bible verses. (*See* Doc. 38 at 11.) This argument challenges Rooks's evidence as a matter of law. (*See id.*) To address it, the Court must begin its analysis by looking at *Driehaus* and the context in which the United States Supreme Court created its test for pre-enforcement standing.

At issue in *Driehaus* was a challenge to an Ohio statute criminalizing "false statement[s] concerning the voting record of a candidate or public official" or "post[ing], publish[ing], circulat[ing], distribute[ing], or otherwise disseminat[ing] a false statement concerning a candidate." 573 U.S. at 152 (internal citations omitted). The lower courts held a lawsuit filed by Susan B. Anthony List lacked a cognizable injury because there was no active complaint against its political advertising. *See id.* at 155-57. The Supreme Court accepted certiorari to address the "recurring issue . . . [of] determining when the threatened enforcement of a law creates an Article III injury." *See id.* at 158. The Court explained the injury-in-fact requirement for pre-enforcement standing only requires there be "threatened enforcement [that is] sufficiently imminent." *See id.* at 159. It then provided a three-element test to determine when threatened enforcement has occurred. *See id.*

The reasoning of *Driehaus* indicates the Supreme Court intended to "set the general standard for pre-enforcement standing." *See Tingley*, 47 F.4th at 1067 (9th Cir. 2022). But its context also indicates the Court fashioned its test around the specific issue before it: whether Susan B. Anthony List had standing to challenge Ohio's statute criminalizing false political speech. *See Driehaus*, 573 U.S. at 158. *Driehaus*, therefore, sets the appropriate framework for analyzing pre-enforcement standing. *See Tingley*, 47 F.4th at 1067. It does not, however, mean pre-enforcement standing only applies to challenges to enacted laws. *See id.* The Court's reasoning leaves room for the idea pre-enforcement standing can also apply to a wider range of government conduct. *See id.* And the Court's broader caselaw indicates a pre-enforcement injury can arise based on government action alone.

The Supreme Court's pre-*Driehaus* holding in *Laird v. Tatum*, 408 U.S. 1 (1972), helps prove this point. There, the Court considered whether the existence and operation of a government data-gathering program sufficiently chilled First Amendment rights to create standing. *See id.* at 10. The plaintiffs in *Laird* were a group of civilians who argued a cognizable injury arose from the possible collection and misuse of their information by the government. *See id.* The civilians did not attempt to establish misuse was "a definitely foreseeable event." *See id.* Rather, they primarily relied on misuse occurring at some point in the future. *See id.*

To address these arguments, the Court began by recognizing a constitutional injury can arise when speech is chilled by the exercise of government power. *See id.* at 10-11; *see also Saline Parents v. Garland*, 88 F.4th 298, 304 (D.C. Cir. 2023) (explaining *Laird* makes clear there is a "cognizable chilling injury"). But the Court also emphasized an injury premised on chilled speech was not a boundless expansion on standing. *See Laird*, 408 U.S. at 12-13. It identified two restrictions on the application of pre-enforcement chilling injuries. First, such injuries do not erode the "established principle that . . . to invoke the judicial power to determine the validity of executive or legislative action [a plaintiff] must show that he has sustained, or is immediately in danger of sustaining, a direct injury as the

result of that action." *See id.* at 13 (quoting *Ex parte Levitt*, 302 U.S. 633, 634 (1937)). Second, a plaintiff must show "the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the [plaintiff] was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging." *See id.* at 11.

Ultimately, the Court used these principles to conclude the civilians lacked standing. *Id.* at 13. Their injury related to the possible future misuse of information was speculative. *Id.* Thus, any chilling of First Amendment speech was based on the civilian's subjective beliefs, which the Court referred to as "subjective chill," rather than any objective threat of government action. *See id.*; *see also Zimmerman v. City of Austin*, 881 F.3d 378, 389-90 (5th Cir. 2018) (stating "government action that chills protected speech without prohibiting it can give rise to a constitutionally cognizable injury, to confer standing, [but] allegations of chilled speech or self-censorship must arise from a fear of prosecution that is not imaginary or wholly speculative") (internal citations omitted).

Relevant for this case, *Laird* recognizes chilled speech can occur based on the exercise of government power. *See* 408 U.S. at 10-11. That reasoning encompasses government action divorced from a specifically enacted law. *See id.* And it supports finding a pre-enforcement injury can arise based on stand-alone government action that chills First Amendment rights. *See id.* When deciding *Laird*, the United States Supreme Court also set several boundaries for pre-enforcement standing premised on government action. Those restrictions allow *Laird* to comfortably fit within the normal pre-enforcement analysis occurring under the second *Driehaus* requirement. As an example, the first boundary set by the Court is government action must result in a sustained injury or create an immediate danger of injury before the court can grant a litigant federal jurisdiction. *See id.* This requirement is like the "sufficiently imminent" standard outlined in *Driehaus*, 573 U.S. at 158-59. In addition, *Laird*'s requirement that government action be "regulatory, proscriptive, or compulsory in nature" is similar to examining the conduct proscribed by a challenged law. *Compare Laird*, 408 U.S. at 11, *with Yellen*, 34 F.4th at 849. And its

requirement for a plaintiff to be "either presently or prospectively subject to the regulations, proscriptions, or compulsions" is similar to analyzing whether the desired conduct fits within the challenged law's sweep. *Compare Laird*, 408 U.S. at 12, *with Yellen*, 34 F.4th at 849.

Finally, and perhaps most importantly, *Laird*'s reasoning goes to the very purpose behind pre-enforcement standing. Pre-enforcement standing based on the First Amendment lessens the injury-in-fact requirement of Article III because the "chilling of First Amendment rights is, itself, a constitutionally sufficient injury," and the transcendent value of free expression warrants allowing litigants to discern their rights before the normal case and controversy requirements are met. *See Tingley*, 47 F.4th at 1067; *Bayless*, 320 F.3d at 1006. This underlying purpose sets the focus of pre-enforcement standing at whether First Amendment rights are being chilled. *See Bayless*, 320 F.3d at 1006; *see also Peace Ranch, LLC*, 93 F.4th at 485 ("We conclude that the substantial threat of enforcement, and not the likelihood that any such enforcement action would ultimately lead to sanctions, drives our analysis [for pre-enforcement injury]."). And *Laird* simply recognizes chilling can occur in more ways than through an enacted statute; it can also occur through government action that is "regulatory, proscriptive, or compulsive" in nature. *See* 408 U.S. at 11. The Ninth Circuit has endorsed a similar view by holding government action alone can chill First Amendment rights. *See White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000) (holding an investigation that did not result in an arrest still chilled First Amendment expression). Accordingly, there is no requirement for a pre-enforcement injury to be premised on a challenge to an enacted law.

PUSD argues Rooks does not meet the second *Driehaus* requirement because she does not identify a rule, regulation, or policy that prevents her from reciting Bible verses at board meetings. (*See* Doc. 38 at 11.) But as the previous analysis shows, that is an overly restrictive interpretation of *Driehaus*. The Court, therefore, finds PUSD's argument unpersuasive. It cannot, as a matter of law, find Rooks fails to meet the second *Driehaus* requirement simply because there is no specific policy being challenged.

2)    **Chilled Speech Based on Emails**

Rooks argues her First Amendment rights were chilled based on the "explicit warnings" contained in the emails from the Board's executive assistant and attorney. (Doc. 41 at 10-11.) She interprets the emails as threats of future adverse action by PUSD should she continue reading Bible verses at board meetings. (*See id.* at 9-10, 12-13.) Those supposed threats, according to Rooks, put her in a defensive posture that resulted in self-censorship. (*See id.* at 10-11; *see also id.* at 9 ("Rooks'[s] self-censorship demonstrates an injury-in-fact because the summary judgment record conclusively establishes—exactly as Rooks stated at the time—that her anticipation of further adverse action by [PUSD] was actual and well-founded based on [PUSD's] credible threat of proceeding against her.") (internal quotation marks omitted).)

A government communication can be a sufficient basis for pre-enforcement standing. *See Culinary Workers Union v. Del Papa*, 200 F.3d 614, 618 (9th Cir. 1999) (finding a letter from the attorney general that demonstrated an intent "to enforce a statute or encourage local law enforcement agencies to do so" was a sufficient basis for a pre-enforcement injury). But because Rooks argues the content of the emails is what caused her to self-censor, as well as the implicit threat of future action those emails supposedly carried, this is not a typical pre-enforcement challenge concerning chilled speech from a law or policy. (Doc. 41 at 9-10, 12-13.) Rather, the challenge concerns chilled speech resulting from government action, an argument akin to *Laird*.

*Laird* explains a cognizable injury can occur when government action chills First Amendment expression. *See* 408 U.S. at 11. It also provides a two-step process for analyzing when government action prevents First Amendment speech. *See id.* First, the action must be of a type that arguably chills constitutional rights, such as conduct that is "regulatory, proscriptive, or compulsory in nature." *See id.*; *O'Keefe v. Van Boening*, 82 F.3d 322, 325 (9th Cir. 1996). Second, the party asserting standing must show they are subject to the government action being challenged. *See Laird*, 408 U.S. at 11. When both requirements are met, the government action arguably prevented the intended conduct, and

the second *Driehaus* requirement is satisfied. *See id.*; *Driehaus*, 573 U.S. at 160.

*Laird*'s first step requires the government action be of a type that arguably chills constitutional rights. 408 U.S. at 11. PUSD argues the emails are legal advice "on how to avoid possible future legal liability." (Doc. 45 at 4.) Whereas Rooks argues they are written warnings of a legal violation that carried an implicit threat of future action by PUSD. (*See* Doc. 41 at 9, 12.) Their respective positions fundamentally disagree on the government action at issue in this case. The Court must resolve the disagreement before proceeding under *Laird*'s first step.

When looking at the two emails, both were addressed to the entire Board and concerned legal advice about the lawfulness of reciting Bible verses at board meetings. (*See* Doc. 34 at 61, 64-66.) Both concluded reciting scripture was unlawful, and each recommended board members should stop the practice. (*Id.* at 61, 64-65.) Moreover, the email from the Board's attorney specifically warned continuing to recite scripture could result in PUSD being sued and individual Board members being investigated by the Arizona Attorney General (*Id.* at 65.) Based on the content of the emails, it appears PUSD is correct: the emails are legal advice designed to explicitly warn board members about potential legal liability from third parties. (Doc. 45 at 4.)

It is also helpful to classify the emails based on what they do not contain. Nowhere in the emails does it say the Board will refer board members to the Arizona Attorney General for reciting Bible verses. Nor does it say the Board President will cut a board member's microphone at the mention of scripture. In fact, even after the Freedom from Religion Foundation specifically asked the Board "to censure any school board members who abuse their position by pushing their personal religious beliefs during board meetings" (Doc. 34 at 58), the Boards' attorney still refrained from including any mention of censure in her subsequent email. (*Id.* at 64-66.) Indeed, if the Court were to construe the type of advice provided in the emails as a threat, as Rooks suggests, it would risk chilling an entirely different type of speech—conversations between attorneys and their clients. That is something the Court is not willing to do. The Court finds the emails are legal advice

from the Board's attorney. *Laird*'s first step asks whether such advice arguably chills constitutional rights. 408 U.S. at 11.

By its very nature, legal advice is not regulatory or prescriptive in nature because it is non-binding. *See Laird*, 408 U.S. at 11. Therefore, the emails from PUSD are unlike those categories of conduct, and the only remaining category under *Laird* is government action that is "compulsory in nature." *See id.*

In deciding whether legal advice carries a compulsory nature, the Court finds the United States Supreme Court's holding in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), instructive. In *Bantam Books, Inc*, the Rhode Island Legislature created an organization called the Rhode Island Commission to Encourage Morality. *Id.* at 59. The commission sought to stop the distribution of obscene materials to children. *Id.* It did so by notifying distributors "that certain designated books or magazines distributed by [them] had been reviewed" by the commission and declared "objectionable for sale, distribution, or display to" children. *Id.* at 61. The notices thanked distributors in advance for their anticipated cooperation since it obviated the commission's duty "to recommend to the Attorney General prosecution of purveyors of obscenity." *Id.* at 62. Police would then follow up with distributors to ensure they complied with the notices. *See id.* at 63.

The Court ultimately held Rhode Island violated the First Amendment by employing a "system of informal censorship" that was "clearly [designed] to intimidate" distributors. *See id.* at 64, 71. But relevant for this case is the Court's response to the commission's argument it was simply advising booksellers of their legal rights. *See id.* at 67. In response to that argument, the Court looked at the acts and practices used by the commission to conclude it "deliberately set about to achieve the suppression of publications deemed objectionable and succeeded in its aim." *Id.* Evidence found persuasive by the Court included commission members acting under the color of state law, phrasing the notices as orders, and ensuring police would follow-up after a distributor received a notice. *See id.* at 68. The Court stated those practices distinguished the commission's actions from providing "mere legal advice." *See id.*

The Court also made sure to explain its holding did not prevent contacts between the government and its citizens that are "genuinely undertaken" to ensure compliance with the law and avoid prosecution. *See id.* at 72. The Court noted those contacts do not offend the First Amendment, provided the government entity is qualified to give legal advice and does so with an intent to fairly advise a citizen of their legal rights and liabilities. *See id.*

*Bantam Books, Inc.*, indicates "mere legal advice," standing alone, is not coercive government action. *See id.* at 68. Attempts to persuade by the government are permissible under the First Amendment. *See Kennedy v. Warren*, 66 F.4th 1199, 1207 (9th Cir. 2023). Government speech, however, ventures into unconstitutional coercion when a government "official intimates that [they] will use [their] authority to turn the government's coercive power against the target if it does not change its ways." *See id.* at 1209. From this reasoning, the relevant question is whether the emails from the Board's executive assistant and attorney arguably suggested PUSD would turn its power against Rooks. (*See* Doc. 41 at 10-11 (stating the "explicit warnings" contained in the emails is what caused Rooks to self-censor).)

Looking again at the emails, the email from the Board's assistant was prompted by "a fellow board member request[ing] a conversation with the [Board's] attorney." (Doc. 34 at 61.) It summarized the attorney's guidance as "a board member . . . should not read Scripture during a board meeting" and "the First Amendment is not applicable in this situation." (*Id.*) The email concluded with, "[m]oving forward, we hope this provides the [Board] with the legal clarifications needed to conduct efficient business meetings." (*Id.*)

The second email, from the Board's attorney, stated "[t]he law is clear that [b]oard members, acting in their official capacities at [b]oard meetings, may not pray or offer [B]ible verses at Board meetings because it is a violation of the establishment clause of the U.S. Constitution." (*Id.* at 64-65.) The email continued, "offering [B]ible verses during a board report is a violation of the Open Meeting Law," and "[t]he risk to [PUSD] and to individual board members if board members continue to recite [B]ible verses is twofold." (*Id.* at 65.) It explained PUSD could be sued if members continued reciting Bible verses.

(*Id.*) Or the Attorney General could pursue an open meeting law complaint "against both [PUSD] as a whole and any individual board member who violates the open meeting law," resulting in potential "fines levied against board members and, in some cases, a lawsuit to remove a board member from office." (*See id.*) The email concluded with, "[f]or these reasons, it would be in the best interest of [PUSD] to cease offering [B]ible verses at [b]oard meetings." (*Id.*)

There is nothing on the face of the emails to arguably suggest PUSD intended to do anything other than provide legal advice to board members. *See Kennedy*, 66 F.4th at 1207 (stating word choice and tone can be indicative of coercive intent). While the second email was certainly more ominous, "referencing potential legal liability does not morph an effort to persuade into an attempt to coerce," and the second email is fairly read as providing a legal opinion and explaining the potential consequences if that opinion is not followed. *See id.* at 1209; (Doc. 34 at 64-65.) Thus, the two emails are "mere legal advice," which *Bantam Book, Inc.* suggests is not coercive government action. 372 U.S. at 68.

Government action can still chill speech even when it is not "regulatory, proscriptive, or compulsory in nature." *See Laird*, 408 U.S. at 11 (indicating the list is non-exclusive). Publicly labeling films as "political propaganda" has been found to chill speech by the United States Supreme Court. *See Meese v. Keene*, 481 U.S. 465, 473-74 (1987). And government investigations, under certain circumstances, have been found to chill speech by the Ninth Circuit Court of Appeals. *See White*, 227 F.3d at 1228-29; *The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 522 (9th Cir. 1989).

But legal advice is dissimilar from these other types of government action. The advice is private, distinguishing it from public labeling. *See Meese*, 481 U.S. at 473-74. And it does not start the process of criminal sanctions—the underlying premise behind chilled expression from a government investigation. *See White*, 227 F.3d at 1228-29. Rooks attempts to equate PUSD's advice as the start of formal proceedings being brought against her. (*See* Doc. 41 at 10-12.) The difference, however, lies in the fact a government investigation is brought for the purpose of discerning whether to pursue subsequent action.

1    Legal advice, on the other hand, only warns subsequent action could possibly occur. That
2    distinction is especially true for this case, where the focus of the advice was on potential
3    actions from third parties. (Doc. 34 at 65.) As such, the legal advice provided in the emails
4    is not a type of government action that arguably could have chilled Rooks's First
5    Amendment expression. *See Laird*, 408 U.S. at 11-12 (stating a cognizable injury requires
6    an action that could chill speech).

7    Rooks argues the emails satisfy the second *Driehaus* requirement because "the
8    alleged harm 'implicates First Amendment rights,'" meaning "the inquiry tilts dramatically
9    toward a finding of standing." (*See* Doc. 41 at 9 (quoting *Bayless*, 320 F.3d at 1006).) It is
10   true the standing requirements are relaxed in instances of pre-enforcement challenges based
11   on the First Amendment. *See Twitter, Inc.*, 56 F.4th at 1173. But that relaxed standard
12   "does not mean . . . that any plaintiff may bring a First Amendment claim 'by nakedly
13   asserting that his or her speech was chilled.'" *See id.* at 1174 (quoting *Cal. Pro-Life
14   Council, Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003)). The Court has performed a
15   detailed review of the relevant precedent, and there is nothing to suggest legal advice,
16   standing alone, is the type of conduct that prevents First Amendment expression. There is
17   also nothing in the evidence presented by Rooks to indicate the emails from the Board's
18   executive assistant and attorney were intended to be veiled threats of future action by
19   PUSD. Thus, Rooks's argument amounts to nothing more than a bare assertion her speech
20   was chilled.

21   With neither of the emails indicating government conduct that is "regulatory,
22   proscriptive, or compulsory in nature," and with the emails being dissimilar from other
23   forms of government action that have previously been found to chill speech, Rooks has
24   failed to meet her burden under the second *Driehaus* requirement. *Lujan*, 504 U.S. at 561.
25   Therefore, Rooks has not suffered a pre-enforcement injury, and she lacks standing to bring
26   her first and second claims for declaratory relief.

27

28

1

### d.    Third *Driehaus* Requirement

2        Even assuming Rooks could show her conduct was arguably prevented by PUSD,

3  she would also fail under the third *Driehaus* requirement: whether "there exists a credible

4  threat of prosecution." 573 U.S. at 160. This final requirement "often rises or falls with the

5  enforcing authority's willingness to disavow enforcement." *Peace Ranch, LLC*, 93 F.4th

6  at 490. Yet even before an invoking party can get to the question of disavowal, there must

7  exist a "threat or even [a] hint of future enforcement or prosecution" by the enforcing party.

8  *See Thomas*, 220 F.3d at 1140.

9        Here too, the unique circumstances of this case also weigh on the Court's analysis.

10  The result of the expedited discovery posture is neither party took any depositions or

11  collected any additional discovery besides the five interrogatories and ten requests for

12  admission agreed to in the Stipulated Motion for Deadlines and Discovery. (*See* Doc. 15.)

13  That limited discovery activity failed to produce any additional evidence to support

14  Rooks's burden, besides a response PUSD gave to one of Rooks's interrogatory questions.

15  (*See* Doc. 41 at 14.) As a result, Rooks continues to largely rely on the two emails board

16  members received from their executive assistant and attorney to establish a credible threat

17  of enforcement. (*See id.* at 10-13.) She uses PUSD's interrogatory response—that "PUSD

18  cannot predict how it will respond to future events as it depends on the circumstances

19  present at that time"—as the only additional evidence of an ongoing threat. (*See id.* at 14,

20  42.)

21        More specifically, Rooks argues she faced a credible threat of enforcement from

22  PUSD based on the written warnings of a legal violation contained in the emails from the

23  Board's executive assistant and attorney. (*See* Doc. 41 at 9-13.) Rooks also argues a

24  credible threat of enforcement arose from the emails containing an implicit threat of future

25  action by PUSD should she not heed the legal advice. (*See id.*) Both parties agree the emails

26  contain explicit warnings against quoting scripture at board meetings. (*See id.* at 10-11;

27  Doc. 45 at 3-4.) But as previously discussed, the language in the emails suggest their intent

28  was to provide legal advice to board members, and the warnings the emails contained did

not suggest PUSD was planning on taking any action against Rooks. (*See* Doc. 34 at 61, 64-65.) Rather, the emails only warned third parties to this litigation—such as the Freedom from Religion Foundation, Secular Communities of Arizona, Inc., individual community members, or the Arizona Attorney General—could act against PUSD or Rooks if she continued to read Bible verses. (*See id*. at 64-65) As such, the text of the emails do not provide a "threat or even [a] hint of future enforcement or prosecution" by PUSD. *See Thomas*, 220 F.3d at 1140. Rooks needs to show more to meet the third *Driehaus* requirement. *See id.*

Rooks argues she faced a credible threat based on the emails containing an implicit threat of future enforcement by PUSD. (*See* Doc. 41 at 10-13.) She explains the warnings contained in the emails carry, by their very nature, the implication of consequences should they not be heeded. (*See id.* at 10.)

The Ninth Circuit Court of Appeals provided guidance on how to approach Rooks's argument in *Lopez*. There, a Christian student challenged their university's sexual harassment policy after being called a "fascist bastard" by his professor for a speech on biblical marriage being between a man and a woman, and after that same professor wrote "Remember—you agree[d] to Student Code of Conduct as a student at [the university]" on a subsequent assignment. *See* 630 F.3d at 783, 785. The student argued the professor's comment and note created a credible threat the university would enforce the sexual harassment policy against him if he continued to discuss Christian topics. *See id.* at 784.

In response to the student's argument about the professor's note, the court said "it is plausible to read [the] comment . . . as an implicit threat that [the student] should take care not to raise certain topics . . . and that such topics could violate the [university's] policies." *See id.* at 789. Yet the court ultimately held "such an implied threat does not meet the standard necessary to show injury in fact" because the comment does not "constitute a threat to initiate proceedings if [the student] made [] remarks on marriage or religion." *See id.* The court instead interpreted the note as, "at most, a 'general threat' to enforce the [sexual harassment policy], rather than a 'direct threat of punishment.'" *See id.*

1    (quoting *United Pub. Workers of Am. v. Mitchell*, 330 U.S. 75, 88 (1947)). The court

2    concluded "[s]uch general threats are insufficient to establish an injury in fact." *Id.*

3         *Lopez* indicates an implied threat, without more, does not establish a

4    pre-enforcement injury. *See id.*; *Johnson v. Watkin*, 1:23-cv-00848-KES-CDB, 2024 WL

5    4264007, at *14 (E.D. Cal. Sept. 23, 2024). Like *Lopez*, the emails do not constitute a threat

6    to initiate proceedings against Rooks; in fact, the emails specifically say the threat comes

7    from third parties potentially acting against PUSD and Rooks collectively, or each party

8    individually. *See* 630 F.3d at 789; (Doc. 34 at 61, 64-65.) That means the emails are "at

9    most" a "general threat," which is inadequate to establish a credible threat of enforcement.

10   *See Lopez*, 630 F.3d at 789; *Mitchell*, 330 U.S. at 88.

11        Moreover, while the emails affirmatively warn that a legal violation has

12   occurred—making them different from the warning in *Lopez*—that fact does not transform

13   an implied threat into a cognizable injury. As *Lopez* explains, the focus concerns whether

14   the threat involves initiating proceedings against the party seeking pre-enforcement

15   standing. *See id.* The emails indicate the only threat to Rooks is from third parties. Thus,

16   the warnings contained in the emails do not create a credible threat of enforcement.

17        Some federal circuit courts have held a credible threat can arise from the "implicit

18   threat of punishment and intimidation" involved in communications between the

19   government and an individual. *See Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th

20   Cir. 2019); *see also Speech First, Inc. v. Fenves*, 979 F.3d 319, 332-33 (5th Cir. 2020). As

21   an example, in *Schlissel*, the Sixth Circuit Court of Appeals considered the constitutionality

22   of the University of Michigan's "Bias Response Team Initiative." 939 F.3d at 762. The

23   initiative created "response teams," which acted as a constituent part of the university by

24   responding to student-reported "bias incidents." *See id.* When a bias incident was reported,

25   the initiative allowed members of the response team to contact "person[s] alleged to be

26   responsible for the incident" and invite them "to voluntarily meet with a member of the

27   [response team]." *See id.* The meeting could not be compelled, and members of the

28   response team "ha[d] no direct punitive authority." *See id.* at 763. But members could

"make referrals to police, [the University of Michigan's Office of Student Conflict Resolution], or other school resources such as counselling services." *See id.* at 763.

The Sixth Circuit held the plaintiffs in *Schlissel* had standing to challenge the initiative "because its members face[d] an objective chill based on the functions of the [r]esponse [t]eam." *Id.* at 765. The court explained the response team "acts by way of implicit threat of punishment and intimidation to quell speech" through its ability to refer reported conduct to the police or university officials. *See id.* That referral power "itself does not punish a student," but it does "subject[] students to processes which could *lead* to . . . punishments" like a criminal conviction or expulsion. *See id.* The court thus equated an invitation to meet with a member of the response team as initiating the formal investigative process. *See id.* It concluded the beginning a formal investigative process chills First Amendment rights "even if it does not result in a finding of responsibility or criminality." *See id.*

In addition, the court noted the referral powers given to members of the response team "could carry an implicit threat of consequence[s] should a student decline the invitation" to meet. *Id.* It explained "a student who knows that reported conduct might be referred to police or [university officials] could understand the invitation to carry the threat: meet or we will refer your case." *See id.* (internal quotation marks omitted). As such, the court also concluded an invitation to meet chilled First Amendment speech due to the "referral power lurk[ing] in the background of the invitation." *See id.*

Rooks's argument could be construed as advancing an argument similar to the plaintiffs in *Schlissel*. Rooks argues the legal advice contained in the emails was actually an implicit threat for her to stop reading Bible verses or else face future adverse action from PUSD. (*See* Doc. 41 at 9-10, 12-13.) Like *Schlissel*, this argument could be premised on a credible threat arising from the very act of the Board's executive assistant and attorney sending emails to board members—one that lurks in the background of the advice. *See* 939 F.3d at 765.

There are, however, several important differences between the legal advice provided in the emails and the school initiative in *Schlissel*. In *Schlissel*, the implicit threat arose from the relationship between the students accused of a bias incident and the response team. *See id.* at 762, 765; *see also Somberg v. McDonald*, 117 F.4th 375, 380 (6th Cir. 2024). The response team acted as a constituent part of the university—an entity with authority over the students. *See Schlissel*, 939 F.3d at 762. So when the response team asked a student accused of a bias incident to meet, there was an appearance of punitive authority that chilled First Amendment rights. *See id.* at 765.

Here, PUSD is governed by the Board. (*See* Doc. 1 ¶ 12; Doc. 38 at 4.) And the Board "retain[s] and exercise[s] full legislative authority and control over [PUSD] by adopting general policies or by acting directly in matters not covered by its policies." (*See* Doc. 38-8 at 7.) A general policy is adopted by a two-step process where "the proposal [is] presented for review" at a first meeting and then "presented for discussion and action" at a second. (*See id.* at 9.) As a member of the Board, Rooks gets to participate in the policy-making process and exercise authority over PUSD. (*See id.*) Therefore, the dynamic between PUSD and Rooks is unlike the situation in *Schlissel*. *See* 939 F.3d at 762, 765.

In addition, the government action at issue in *Schlissel* was the response team's referral powers and ability to invite students to participate in meetings. *See id.* at 762-63. But when the Sixth Circuit considered the response team's powers as a whole, it classified those actions as initiating a formal investigation against the accused students. *See id.* at 765. A formal investigation creates a more credible threat than providing legal advice. Therefore, the act of sending legal advice to the Board also does not create a credible threat of enforcement.

None of the cases cited by Rooks demand a different conclusion. Rooks cites *Chesebrough-Pond's Inc. v. Faberge, Inc.*, 666 F.2d 393 (9th Cir. 1982), and *California Trucking Association v. Bonta*, 996 F.3d 644 (9th Cir. 2021), to suggest a credible threat of enforcement arises whenever there is a written warning of a legal violation. (*See* Doc. 41 at 10, 12-13.) But in both cases, the party seeking pre-enforcement standing presented

evidence of a written warning and intent by the enforcing authority to commence proceedings. In *Chesebrough-Pond's Inc.*, the intent to commence proceedings came from the defendant sending a letter "declaring its intent to file opposition proceedings." 666 F.2d at 396. And in *Bonta*, intent was shown by the state of California notifying "the regulated community that it intend[ed] to enforce" the challenged provision and subsequently sending letters telling the community to implement the provision into their business practices. *See* 996 F.3d at 653. Thus, both cases went beyond providing a written warning of a legal violation. Each case also demonstrated the entity being sued intended to pursue further action because of the legal violation, as opposed to simply alerting the invoking party a legal violation has occurred.

Rooks also cites *Del Papa* as support for her argument PUSD cannot "evade responsibility for its threats by pointing to the fact that it was responding to threats made by" third parties. (Doc. 41 at 13.) *Del Papa*, however, involved a unique situation where the Nevada Attorney General sent a letter warning she would enforce a challenged provision against the invoking party, or refer the party for prosecution to local authorities, if they did not conform their conduct. 200 F.3d at 616. So evidence of intent to pursue further action, which is lacking in this case, was also present in *Del Papa*. The Court, therefore, finds none of Rooks's cases persuasive.

The fact PUSD has refused "even today to disavow further action against Rooks" also does not change the Court's analysis. (Doc. 41 at 14.) During the Parties' agreed-upon expedited discovery, Rooks submitted an interrogatory question that asked: "If it is Your position that [PUSD] will not take any adverse action against [Rooks] related to her reciting of scriptures from the Bible during her [b]oard comments at [b]oard meetings . . . so state that." (*Id.* at 42.) PUSD objected to the question, stating it was hypothetical because "PUSD cannot predict how it will respond to future events as it depends on the circumstances present at that time." (*See id.*)

Within the context of pre-enforcement standing, an established principle is a "government's disavowal [of an intent to enforce] must be more than a mere litigation

position" to avoid a pre-enforcement injury. *See Lopez*, 630 F.3d at 788. This principle is often used to prevent a government agency from simply denying enforcement after litigation has commenced. *See id.* The Court, however, also understands the principle as preventing it from placing too much weight on statements made by the parties during the forays of litigation. The response by PUSD could provide some evidence of an intent to pursue further action against Rooks. (*See* Doc. 41 at 42.) But it could also mean PUSD did not feel comfortable with the language of the question or that answering the question would hamper its ability to defend this case. Thus, any evidence of intent provided by PUSD's response is minimal.

Moreover, government disavowal only matters after the invoking party demonstrates a "threat or even [a] hint of future enforcement or prosecution" exists by the enforcing party. *See Thomas*, 220 F.3d at 1140. The previous analysis shows there is no threat or hint of a threat from PUSD. So the Court does not need to address the issue of PUSD's response.

Finally, Rooks being interrupted at the March 2023 board meeting does not establish a credible threat. If anything, Rooks's injury from the interruption has already occurred and, on this record, is not an appropriate basis for a pre-enforcement injury.

For these reasons, none of the arguments presented by Rooks indicates a credible threat of enforcement existed from PUSD. The evidence instead suggests the threat of enforcement arose from third parties to this litigation. Accordingly, even if Rooks was arguably prevented from reciting Bible verses, she still could not satisfy the third *Driehaus* requirement. The Court concludes Rooks lacks a pre-enforcement injury. She cannot bring her first and second claims for declaratory relief.

### iii.    Post-Enforcement Injury in Fact

In instances where enforcement has already occurred, the injury-in-fact analysis "focuses directly on the three elements that form the 'irreducible constitutional minimum' of Article III standing"—*i.e.* the injury is "(a) concrete and particularized, and (b) actual or imminent." *Twitter, Inc.*, 56 F.4th at 1174; *Lopez*, 630 F.3d at 785 (quoting *Lujan*, 504

U.S. at 560). A concrete injury must actually exist, but it does not need to be tangible. *See Phillips v. U.S. Customs & Border Prot.*, 74 F.4th 986, 991 (9th Cir. 2023). An intangible injury is sufficiently concrete "if it presents a material risk of *tangible* harm or 'has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts,' like common law torts or certain constitutional violations.'" *See id.* (quoting *Spokeo Inc.*, 578 U.S. at 340). A restriction on First Amendment freedoms is a well-established constitutional violation that can satisfy Article III standing. *See Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1112 (9th Cir. 2017).

Because the injury-in-fact requirement of standing diminishes in the context of pre-enforcement challenges, evidence failing to meet the standard for a pre-enforcement challenge will also lose under the post-enforcement requirement for a concrete injury. *See Twitter, Inc.*, 56 F.4th at 1173; *Mayfield v. United States*, 599 F. 3d 964, 970 (9th Cir. 2010) ("[A person] who has standing to seek damages for a past injury . . . does not necessarily have standing to seek prospective relief . . . ."). As such, the emails from PUSD do not establish a post-enforcement injury.

Rooks instead argues her post-enforcement injury arose from other board members disrupting her speech during board comments. (*See* Doc. 41 at 19.) During oral argument, Rooks clarified her position as a First Amendment violation occurs anytime a board member is stopped from speaking.

At the March 9, 2023, board meeting Rooks was interrupted while discussing her research around a mental health grant PUSD was awarded back in 2019. *Peoria Unified Governing Board Meeting (March 9, 2023)*, *supra*. The interruption occurred about two minutes after Rooks recited Corinthians 16:13. *See id.* And the Board President, who interrupted Rooks, said: "each one of us has received an email from legal around discussing items that aren't on the agenda during board comments and how by doing so goes against open meeting laws." *Id.* The Board President continued, "[w]e were also told that reciting scripture at a board meeting on this side of the dias goes against the Establishment Clause . . . . We were directed by legal on this, so it is important that I bring it up, so I just

1    needed to make that comment." *Id.* At this point, several members of the audience began
2    to express their disapproval over the interruption. *See id.* The Board President then ceded
3    the floor back to Rooks and allowed her to continue with her board comments. *Id.*

4         Later, during the April 13, 2023, meeting Rooks was interrupted while discussing a
5    school safety grant during her board comments. *Peoria Unified Governing Board Meeting*
6    *(April 13, 2023)*, *supra*. The Board President reminded Rooks "of the importance of staying
7    within our open meeting law governance." *Id.*

8         Rooks points to *Bond v. Floyd*, 385 U.S. 116 (1966), to suggest these interruptions
9    created a cognizable post-enforcement injury. (Doc. 41 at 19.) In *Bond*, the United States
10   Supreme Court held a state legislator's First Amendment rights were violated when his
11   colleagues disqualified him from office due to comments he made on the Vietnam War.
12   385 U.S. at 125, 136-37. *Bond* is understood by the Ninth Circuit as preventing "retaliatory
13   acts of elected officials against their own" when those acts have "the effect, deleterious to
14   democracy, of nullifying a popular vote." *See Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 545
15   n.4 (9th Cir. 2010).

16        PUSD challenges Rooks's theory of standing based on *Houston Community College*
17   *System v. Wilson*, 595 U.S. 468 (2022). (*See* Doc. 45 at 8-9.) There, the United States
18   Supreme Court held a verbal censure did not constitute an adverse action under a First
19   Amendment retaliation claim. *See Wilson*, 595 U.S. at 482-83. To reach its conclusion, the
20   Court found history suggested a purely verbal censure did not offend the First Amendment.
21   *See id.* at 477. It also found modern precedent supported classifying a verbal censure,
22   without more, as a non-material adverse action. *See id.* at 478. On this second point, the
23   Court found plaintiff's status as an elected official important. *See id.* As an elected official,
24   the plaintiff in *Wilson* was "expected to shoulder a degree of criticism about their public
25   service from their constituents and peers." *See id.* The Court further stated the plaintiff's
26   status as an elected official also meant censuring from other board members was itself
27   protected speech. *See id.*

28

The Ninth Circuit Court of Appeals' precedent aligns with the reasoning provided in *Wilson*. *See Boquist v. Courtney*, 32 F.4th 764, 775 (9th Cir. 2022). In *Blair v. Bethel School District*, the court considered whether removing an elected school board member from their internal position as vice president was an adverse action. *See* 608 F.3d at 542-43. The court agreed "the First Amendment doesn't shield public figures from the give-and-take of the political process." *See id.* at 543. It explained the action being challenged in *Blair* was taken in the political arena and "was a rather minor indignity" when compared against typical adverse action claims. *See id.* at 543-44. The court continued "more is fair in electoral politics than in other contexts" when it comes to the First Amendment. *See id.* at 544-45. And that all board members have a First Amendment interest in "speaking out and voting their conscience on the important issues they confront." *Id.* at 545.

Although the Court notes *Wilson* and *Blair* are not dispositive, it finds their reasoning persuasive in determining whether Rooks has a sufficiently concrete injury to establish post-enforcement standing. *See Wilson*, 595 U.S. at 482 ("Our case is a narrow one."). Rooks was not interrupted while reading Bible verses. Instead, the interruptions only came later in her board comments and sometimes were wholly unrelated to Rooks's recitation of scripture. As an example, during the February 23, 2023, meeting, it was Rooks's comments about a mental health grant that prompted the Board President to briefly interrupt her about "discussing items that aren't on the agenda during board comments." *Peoria Unified Governing Board Meeting (February 23, 2023)*, *supra*. Only after discussing Arizona's open meeting requirements did the Board President transition to Rooks's practice of reciting Bible verses. *See id.* Similarly, at the April 13, 2023, meeting it was Rooks's comments about a school safety grant that prompted an interruption from the Board President—again, concerning staying within the agenda. *Peoria Unified Governing Board Meeting (April 13, 2023)*, *supra*.

With this context in mind, the interruptions are detached from Rooks's core religious speech and seem much closer to the speech at issue in *Wilson* and *Blair*. *See Blair*,

608 F.3d at 545 n.3 (indicating the speech at issue in *Blair* was a type of political speech that did not deserve heightened scrutiny). Both interruptions were premised on Rooks discussing matters of policy and other board members believing she was doing so outside of the proper procedure. The interruptions were brief. And the other members even directed Rooks to appropriate times where the information could be discussed. *See Peoria Unified Governing Board Meeting (April 13, 2023)*, *supra*. It is, therefore, hard to see how the interruptions resulted in "material risk of *tangible* harm" or resemble a close relationship to a traditional First Amendment harm. *See Phillips*, 74 F.4th at 991. Prevailing First Amendment case law indicates elected officials are not harmed by verbal censures or other forms of protected speech exercised by their peers. *See Wilson*, 595 U.S. at 482-83; *Blair*, 608 F.3d at 544-45. A brief interruption—which is a noticeably lesser intrusion—would seem to also fail under that standard.

Moreover, Rooks cites only a few unconnected cases to support her theory of harm. (*See* Doc. 41 at 18-19.) *Bond* stands for the general proposition "retaliatory acts [by] elected officials against their own" based on protected speech is unconstitutional. *See* 385 U.S. at 136-37; *Blair*, 608 F.3d at 545 n.4. But that does not mean a cognizable injury arises anytime speech is interrupted, as Rooks suggests. Indeed, if Rooks's argument were taken to its logical end, a politician could sue their political opponent anytime an interruption occurs during political debate. Such a result would upend our democratic process and unravel the separation of powers between the branches.

Looking at Rooks's other cases, *Jacobs v. Clark County School District*, only concerns the availability of nominal damages as relief for a First Amendment violation. *See* 526 F.3d, 419, 426 (9th Cir. 2008). And *Brodheim v. Cry* is inapplicable because Rooks is an elected official who faces a different standard for First Amendment retaliation claims. *Compare* 584 F.3d 1262, 1270 (9th Cir. 2009) (stating "the mere *threat* of harm can be an adverse action, regardless of whether it is carried out because the threat itself can have a chilling effect"), *with Blair*, 608 F.3d at 544 (stating "more is fair in electoral politics than in other contexts"). Rooks's remaining cases stand for general First Amendment principles

that do not go to the issue of standing. The Court, therefore, finds none of Rooks's cases persuasive. More importantly, the Court also finds that Rooks has failed to meet her burden of establishing a cognizable injury for her post-enforcement challenge. *See Lujan*, 504 U.S. at 561. Without a cognizable injury, Rooks lacks standing to bring any of her claims.

## IV.    CONCLUSION

For the reasons stated herein,

**IT IS ORDERED** denying Plaintiff Rooks's Motion for Summary Judgment Motion (Doc. 34).

**IT IS FURTHER ORDERED** granting Defendant Peoria Unified School District's Cross-Motion for Summary Judgment (Doc. 38).

**IT IS FINALLY ORDERED** that the Clerk of the Court must enter judgment for Defendant Peoria Unified School District and close this case.

Dated this 24th day of January, 2025.

Michael T. Liburdi
United States District Judge